**Michigan Supreme Court**
**Lansing, Michigan**

# Opinion

Chief Justice:
Clifford W. Taylor

Justices:
Michael F. Cavanagh
Elizabeth A. Weaver
Marilyn Kelly
Maura D. Corrigan
Robert P. Young, Jr.
Stephen J. Markman

FILED MAY 4, 2006

WEXFORD MEDICAL GROUP,

     Petitioner-Appellant,

v

     No. 127152

CITY OF CADILLAC,

     Respondent-Appellee.

_____

BEFORE THE ENTIRE BENCH

CAVANAGH, J.

     This case calls on this Court to interpret certain provisions of the General Property Tax Act (GPTA), MCL 211.1 *et seq.* Specifically, we must decide whether the Tax Tribunal improperly denied petitioner's request to be exempt from ad valorem property taxes because of its claimed status as a charitable institution under MCL 211.7o and 211.9(a), and its claim that it serves a public health purpose as described in MCL 211.7r. Because there is no statutory language that precludes finding petitioner exempt as a charitable institution, and because exempting petitioner on that basis fully comports with the reasoning of our previous cases, we hold that petitioner does in fact qualify for that exemption.

In refusing to grant the exemption, the Tax Tribunal adopted a wrong principle and misapplied the law by failing to distinguish *ProMed Healthcare v City of Kalamazoo*, 249 Mich App 490; 644 NW2d 47 (2002), and by focusing only on the amount of free medical services plaintiff provided. Instead, the tribunal should have considered plaintiff's unrestricted and open-access policy of providing free or below-cost care to all patients who requested it.

Our finding in that regard makes it unnecessary to determine whether petitioner also exists for a public health purpose. As such, we reverse the part of the Court of Appeals judgment that held that petitioner was not a charitable institution and vacate the part of the judgment that held that petitioner did not exist for a public health purpose. The matter is remanded to the Tax Tribunal for entry of a judgment for the petitioner.

## I. BACKGROUND

Petitioner Wexford Medical Group is a nonprofit corporation that provides health care in Wexford County, Michigan, which is a federally designated health professional shortage area. Petitioner does business as Great Lakes Family Care. Petitioner is a § 501(c)(3)[1] (nonprofit) organization and is owned jointly by Trinity Health Care and Munson Health Care, two other § 501(c)(3) organizations. Petitioner's articles of incorporation identify petitioner's mission as "providing access to quality and affordable health care services to the communities it serves."

---

[1] 26 USC 501(c)(3).

Both its statement of purpose and its bylaws further declare that petitioner will, among other things, conduct its activities within the confines of the rules governing § 501(c)(3) organizations, prevent inurement of funds to private individuals, and refrain from political activities.[2]

In accord with its mission, petitioner has a "charity care" policy and an "open-access" policy for Medicare and Medicaid patients. The charity care policy provides free and discounted health care to anyone whose income is up to twice the federal poverty level. Under its open-access policy, patients are treated on a first-come, first-served basis, and petitioner places no limit on the number of Medicare and Medicaid patients it will treat. In 2000, two patients took advantage of the charity care program; 11 patients used it in 2001. The total value of care rendered to these 13 patients was $2,400. Petitioner also reported that 50 percent of its patients utilized Medicare or Medicaid, which it stated was a significantly higher percentage than was true for other providers in the area.

---

[2] Specifically, the bylaws state as follows:

> The Corporation shall be operated exclusively for charitable, scientific and educational purposes as a nonprofit corporation. No individual Trustee shall have any right, title to or interest in the corporate property or earnings in his/her individual or private capacity and no part of the net earnings of the Corporation shall inure to the benefit of any Trustee or any individual. No substantial part of the activities of the Corporation shall consist of carrying on propaganda or otherwise attempting to influence legislation, nor shall the Corporation participate in or intervene in any political campaign on behalf of or in opposition to any candidate for public office.

In the years at issue, petitioner's annual budget was $10 million, and it handled approximately 40,000 to 44,000 patient visits a year. Petitioner's expected fee collection was as follows: 83 percent recovery from self-pay patients, 75 percent from Blue Cross Blue Shield patients, 60.3 percent from Medicare patients, and 40.4 percent from Medicaid patients. Under its policy of accepting patients who cannot pay their Medicare or Medicaid co-pays, petitioner provided below-cost health care totaling nearly $2 million more than its receipts. Overall, petitioner suffered financial losses in 1999, 2000, and 2001 of $575,000, $731,000, and $673,000, respectively. These losses were subsidized by its parent companies. And while petitioner's goal was to eventually become profitable, its agent testified that any surplus would be invested back into the organization in accord with its statement of purpose.

Petitioner also engaged in a variety of health-based community services such as offering classes, lectures, training, testing and screening, and sports physicals. Other of its community endeavors included treating communicable diseases such as human immunodeficiency virus-acquired immune deficiency syndrome (HIV-AIDS), tuberculosis, hepatitis, and meningitis; treating maladies such as diabetes, obesity, and heart disease; and providing educational services such as disease screening, blood-borne pathogen instruction, defibrillator training, and first aid instruction. A significant number of these and other services provided by petitioner are not provided by anyone else in the community.

After respondent assessed and taxed petitioner's property in 2000 and 2001,[3] petitioner appealed the assessments to the Tax Tribunal. Petitioner argued that it was entitled to the GPTA's charitable institution exemption, MCL 211.7o, and its public health purpose exemption, MCL 211.7r, so it should not have to pay ad valorem property taxes.

MCL 211.7o creates the ad valorem property tax exemption for charitable institutions. Section 70 (1) states as follows:

> Real or personal property owned and occupied by a nonprofit charitable institution while occupied by that nonprofit charitable institution solely for the purposes for which it was incorporated is exempt from the collection of taxes under this act.

The corollary statute addressing personalty, MCL 211.9(a), exempts from taxation

> [t]he personal property of charitable, educational, and scientific institutions incorporated under the laws of this state.

MCL 211.7r, which contains the public health purpose exemption, states, in pertinent part:

> The real estate with the buildings and other property located on the real estate on that acreage, owned and occupied by nonprofit trust and used for hospital or public health purposes is exempt from taxation under this act, but not including excess acreage not actively utilized for hospital or public health purposes and real estate and dwellings located on that acreage used for dwelling purposes for resident physicians and their families.

---

[3] Thirteen percent of petitioner's property is leased to a for-profit entity and is, thus, not tax-exempt; petitioner's arguments pertain only to the remaining 87 percent.

The Tax Tribunal upheld the assessment, finding that petitioner did not qualify for either exemption.  With respect to the charitable institution exemption, the tribunal held that while petitioner extended charity care and indigent services to the community, its primary purpose was to operate as a typical family medical practice.  It found that it could not distinguish petitioner's case from *ProMed, supra*.  The tribunal commented:

> While, unlike *ProMed*, Petitioner is able to document the number of individuals it has served under its charity care policy, serving 13 patients under that program in a two-year time period is not sufficient for a medical practice that has up to 44,000 patient visits per year.

Citing petitioner's $10 million annual budget, the tribunal concluded that "[a] charity care write-off of approximately $2,400 is not an appropriate level of charity care to qualify Petitioner as a charitable institution."

Petitioner appealed the tribunal's decision,[4] and relying heavily on *ProMed, supra*, the Court of Appeals affirmed the tribunal's decision.  *Wexford Med Group v Cadillac*, unpublished opinion per curiam of the Court of Appeals, issued August 24, 2004 (Docket No. 250197).  The Court of Appeals held that petitioner "failed to present evidence that its 'provision of charitable medical care constituted anything more than an incidental part of its operations.'  Specifically, the evidence

---

[4] The Court of Appeals consolidated this case with a similar appeal, *McLaren Regional Med Ctr v Owosso*, unpublished opinion per curiam of the Court of Appeals, issued August 24, 2004 (Docket No. 244386).  An application for leave to appeal in *McLaren* is being held in abeyance for the resolution of this case.  696 NW2d 708 (2005).

indicated that Wexford provided no-cost services to only two people in 2000, and eleven people in 2001, which amounted to writing off $129.13 in 2000, and $2,229.09 in 2001." *Id.*, slip op at 2, quoting *ProMed*, *supra* at 500. The Court of Appeals was also not persuaded by petitioner's argument that it had written off losses sustained from underpayments by Medicare and Medicaid, reasoning as follows: "That the amount of payment under these programs often does not cover the cost of providing the service does not change the character of the service from service in exchange for payment to charity. Further, it is undisputed that Wexford's aim is to become profitable." *Wexford, supra* at 2. The Court was similarly unpersuaded by petitioner's argument that it was a charitable institution because it provided health care in an area deficient of such services.

With respect to whether petitioner served a public health purpose that would entitle it to ad valorem tax exemption, the Court also found against petitioner. The Court concluded that petitioner's "operations parallel a typical private medical clinic, rather than an organization that provides public health services" and that "the services that Wexford claims as serving public health purposes were 'inherent to the medical profession.'" *Id.* at 3. Therefore, petitioner's appeal was rejected.

This Court granted petitioner's application for leave to appeal, 472 Mich 899 (2005), as well as motions by various amici curiae to file briefs. Briefs were received from amici Michigan Rural Health Clinics Organization, McLaren Health Care Corporation, Michigan Health & Hospital Association, and Michigan

7

Association of Homes and Services for the Aging in support of petitioner, and by amici Michigan Municipal League and Michigan Townships Association in support of respondent.

## II. STANDARD OF REVIEW

The standard of review for Tax Tribunal cases is multifaceted. Where fraud is not claimed, this Court reviews the tribunal's decision for misapplication of the law or adoption of a wrong principle. *Michigan Bell Tel Co v Dep't of Treasury*, 445 Mich 470, 476; 518 NW2d 808 (1994). We deem the tribunal's factual findings conclusive if they are supported by "competent, material, and substantial evidence on the whole record." *Id.*, citing Const 1963, art 6, § 28 and *Continental Cablevision v Roseville*, 430 Mich 727, 735; 425 NW2d 53 (1988). But when statutory interpretation is involved, this Court reviews the tribunal's decision de novo. *Danse Corp v Madison Hts*, 466 Mich 175 (2002).

## III. ANALYSIS

While our courts have had occasion to examine the charitable institution and public health purpose statutes in the past, this case tests the boundaries of those decisions by presenting a more finely tuned question. We must now decide precisely how, in the absence of a statutory yardstick, we should measure whether an institution is a "charitable institution" when it performs some level of charitable work. Similarly, we are asked to calculate whether an institution exists for a "public health purpose" when it engages in some level of activities designed to benefit public health. Stated differently, we must determine in which instances an

8

organization claiming to perform charity work or work benefiting the public health does so to an extent that would merit the respective tax exemptions, and, importantly, whether there are any concrete parameters that can be imposed to assist with these inquiries.

Because the Legislature chose not to define the terms "charitable institution," found in MCL 211.7o, or "public health purposes," found in MCL 211.7r, the specific meaning of these phrases has been the subject of decades of case law. Turning our attention first to the term "charitable institution," a brief look back at the development of the law surrounding this phrase is useful to the analysis.

As an initial matter, the seminal cases addressing the meaning of "charitable institution" were written before parts of the GPTA were revised and renumbered by 1980 PA 142. Before those amendments, the pertinent exemption was found in MCL 211.7. In line with the statutory language as it then existed, a four-part test was developed to help assess whether a claimant was entitled to a tax exemption:

> (1) The real estate must be owned and occupied by the exemption claimant;
>
> (2) The exemption claimant must be a library, benevolent, charitable, educational or scientific institution;
>
> (3) The claimant must have been incorporated under the laws of this State;
>
> (4) The exemption exists only when the buildings and other property thereon are occupied by the claimant solely for the

9

purposes for which it was incorporated. [*Engineering Society of Detroit v Detroit*, 308 Mich 539, 550; 14 NW2d 79 (1944).]

Because of the 1980 amendments, the second and third factors must now be adapted to correspond with the present wording of MCL 211.7o. Because the Legislature did not retain language requiring in-state incorporation,[5] we remove factor three. And under factor two, a claimant must now show that it is a "nonprofit charitable institution." Thus, the revised test for this particular subsection is as follows:

(1) The real estate must be owned and occupied by the exemption claimant;

(2) the exemption claimant must be a nonprofit charitable institution; and

(3) the exemption exists only when the buildings and other property thereon are occupied by the claimant solely for the purposes for which it was incorporated.

In the present case, there is no dispute with respect to factors one or three. Nor is there a question whether petitioner is a nonprofit organization; it is.[6]

---

[5] The requirement that to be tax-exempt, an institution be incorporated within the state has been found to be unconstitutional. See *American Youth Foundation v Benona Twp*, 37 Mich App 722, 724; 195 NW2d 304 (1972), citing *WHYY v Glassboro*, 393 US 117; 89 S Ct 286; 21 L Ed 2d 242 (1968).

[6] And the statute's plain language disposes of any argument that an institution is automatically a charitable one if it is first a nonprofit institution. By requiring an institution to show that it is both nonprofit and charitable, the Legislature has presumed that there are instances when a nonprofit institution might not be considered "charitable." See also *Ladies Literary Club v Grand Rapids*, 409 Mich 748, 752 n 1; 298 NW2d 422 (1980) (noting that our tax exemption statutes are more narrowly drawn than the federal statute governing § 501[c][3] corporations).

10

Instead, the central inquiry is whether petitioner is a "charitable institution," and, in a more general sense, what precise meaning that term has.

In examining this issue, we bear in mind the time-honored rules of statutory construction, under which our paramount concern is identifying and effecting the Legislature's intent. *Michigan United Conservation Clubs v Lansing Twp*, 423 Mich 661, 665; 378 NW2d 737 (1985). And where a tax exemption is sought, we recall that because tax exemptions upset the desirable balance achieved by equal taxation, they must be narrowly construed. *Id.*; see also *Michigan Baptist Homes & Dev Co v City of Ann Arbor*, 396 Mich 660, 669-670; 242 NW2d 749 (1976).

## A. "CHARITABLE INSTITUTION"

It appears that the earliest examination of the term "charitable institution," albeit brief, was conducted in *Attorney General v Common Council of Detroit*, 113 Mich 388; 71 NW 632 (1897). Construing a precursor to the current charitable institution exemption statute,[7] this Court determined that real estate of the Masonic Temple Association, the Harmonie Society, and the Arbeiter Society were not exempt from taxation. *Id.* at 390. Although this Court did not discuss the factual

---

[7] At the time, the statute exempted the following property:

> Such real estate as shall be owned and occupied by library, benevolent, charitable, educational and scientific institutions incorporated under the laws of this State, with the buildings and other property thereon, while occupied by them solely for the purposes for which they were incorporated: *Provided*, that such exemption shall not apply to fraternal or secret societies, but all charitable homes of such societies shall be exempt. [1893 PA 206 § 7(4).]

underpinnings of the decision, we did set forth this foundational principle: "It is not enough, in order to exempt such associations from taxation, that one of the direct or indirect purposes or results is benevolence, charity, education, or the promotion of science. They must be organized chiefly, if not solely, for one or more of these objects." *Id.*

An opportunity to construe the term "charitable institution" in a slightly different context presented itself in *Michigan Sanitarium & Benevolent Ass'n v Battle Creek*, 138 Mich 676; 101 NW 855 (1904). At issue in that case was a statute that, in conjunction with a predecessor to MCL 211.7o(3), governed the tax exemption of property gifted to another with the condition that the property be used "'for the purpose of founding or endowing a hospital or other charitable asylum within this State, for the care or relief of indigent or other sick or infirm persons . . . .'" *Id.* at 680, quoting 1897 CL 8288. A dispute arose when the respondent city taxed the petitioner's property because the respondent believed, among other things, that the petitioner was not using the property for charitable purposes as required by the statute.

To determine whether the petitioner was a "charitable" hospital, it was necessary to examine the nature of the petitioner's activities. We observed first that the petitioner operated a hospital in which it treated sick and infirm persons. *Id.* at 682. We noted that the petitioner treated some patients for free and some at a reduced rate. *Id.* And while most of the petitioner's patients paid "a regular schedule of prices fixed by [the petitioner's] management," *id.* at 682, we

12

concluded, because the respondent did not show otherwise, "that the charges collected from patients were not larger than were necessary to the successful maintenance of the institution." *Id.* at 682-683. Therefore, we determined that if we were to accept the respondent's position that to be considered "charitable," the petitioner could accept no fees from patients, we would be adopting the untenable position that "persons who dedicate a hospital to the public must pay taxes on that hospital unless they maintain the same from their private means." *Id.* at 683. We favored a different, more sensible, rule and held that "a corporation is sufficiently charitable to entitle it to the privileges of the act when the charges collected for services are not more than are needed for its successful maintenance." *Id.*

This Court next visited the meaning of "charitable institution" in *Auditor General v R B Smith Mem Hosp Ass'n*, 293 Mich 36, 38; 291 NW 213 (1940), where we again examined the predecessor to the current version of MCL 211.7o. There, we approvingly noted an ALR discussion on tax exemption for charitable institutions:

> "The determination of the exemption in a particular case seems to depend, in the last analysis, upon two things: First, whether the organization claiming the exemption is a charitable one; and, second, whether the property on which the exemption is claimed is being devoted to charitable purposes. In general, it may be said that any body not organized for profit, which has for its purpose the promotion of the general welfare of the public, extending its benefits without discrimination as to race, color, or creed, is a charitable or benevolent organization within the meaning of the tax exemption statutes. In determining whether the property is being devoted to charitable purposes within the meaning of the statute, the rule that tax exemptions are to be construed strictly is generally applied, with the result that, in the absence of a specific charter or statutory

13

provision, no property owned by a charitable institution, but held as a source of income, can escape taxation, although the fact that a charge is made for benefits conferred, against those who are able to pay, in no way detracts from the charitable character of an organization." [*Id.* at 38-39, quoting 34 ALR 634, 635.]

Along with observing this ALR explanation, we relied on the definition we applied in *Michigan Sanitarium*, *supra*, and found that the facts of the case compelled the conclusion that the hospital was tax-exempt. For example, the hospital operated as a public hospital, rather than a private one, relying heavily on donations of money and volunteer work from the community. *Id.* at 40. It was maintained without anyone profiting monetarily from it, and it did not pay any dividends. *Id.* And surpluses, when there were any, were invested back into the hospital and used to maintain it. *Id.* Thus, we held that the hospital was entitled to tax exemption, pointedly noting that an institution does not lose its charitable character merely because "in some years, instead of the usual deficit, it shows a small surplus which is used to supply needed equipment." *Id.* at 41.

On the next occasion we construed the charitable institution exemption statute, we were faced with a petitioner's claim of disparity when two of its nursing homes were granted tax-exempt status, but one, Hillside Terrace, was not. *Michigan Baptist*, *supra*. We affirmed the city's decision to tax Hillside Terrace, cataloguing the following differences between one home owned by another association that was granted tax-exempt status and the one by the petitioner that was not. For instance, Hillside Terrace was funded entirely by loans, debentures, and resident fees. *Michigan Baptist, supra* at 667. In fact, the residents paid a

substantial up-front sum and monthly fees thereafter. *Id.* at 667, 668. Hillside Terrace had losses for two consecutive years, although the petitioner admitted that, should the losses continue, it would raise the residents' fees to eliminate the deficit. *Id.* at 669. The petitioner had neither solicited nor received any gifts, despite that gifts to Hillside Terrace were tax-deductible. *Id.* at 667. The petitioner offered reduced rates to four of its 72 residents in one year and waived the fees for one other resident. *Id.* at 668. Residents were hand-selected by the establishment after an application process that asked them to fully detail their financial status and their health. *Id.* at 668-669. Those who could not show sufficient means or who were in less than reasonably good health were, in large part, rejected. *Id.* at 669.

On the other hand, the other nursing home, the Anna Botsford Bach Home, was endowed by and partially financed through charitable contributions and annual charity drives. *Id.* at 674. Rather than rely on resident fees for its maintenance, operational costs were paid using principal and interest from the endowment fund. *Id.* The Bach Home residents did not pay the full cost of their care, nor were they expected to. *Id.* And residents were accepted on the basis of their lack of ability to find care elsewhere, not on the basis of being in good financial and physical health. *Id.*

We found these differences critical and, thus, rejected the petitioner's equal protection claim that Hillside Terrace deserved the same tax exemption granted to the Bach Home. *Id.* at 674. In light of the fundamental differences in the way the

homes were run, we held that the city's decision to treat the entities differently was fully justified. Moreover, we found that Hillside Terrace, while purported to exist for benevolent, charitable, and general welfare purposes, was not actually furthering those objectives. *Id.* at 671. Because of its selection process and resident-funded mechanism, we concluded that the home did not "serve the elderly generally," but, rather, "provide[d] an attractive retirement environment for those among the elderly who have the health to enjoy it and who can afford to pay for it." *Id.* at 671. This structure for the nursing home, we held, did not comport with the legislative intent behind the charitable institution exemption statute. *Id.*

This Court again visited the meaning of the term "charitable institution" in *Retirement Homes of the Detroit Annual Conference of the United Methodist Church, Inc, v Sylvan Twp*, 416 Mich 340, 348-349; 330 NW2d 682 (1982), wherein we construed another previous version of the charitable institution exemption.[8] The petitioner in *Retirement Homes* sought tax exemption as a charitable institution for the apartment complex it operated in conjunction with a licensed nursing home and a licensed home for the aged. *Id.* at 343. While the

---

[8] At that time, the statute exempted the following types of property:

> [S]uch real estate as shall be owned and occupied by library, benevolent, charitable, educational or scientific institutions and memorial homes of world war veterans incorporated under the laws of this state with the buildings and other property thereon while occupied by them solely for the purposes for which they were incorporated. Also charitable homes of fraternal or secret societies . . . . [MCL 211.7.]

16

two licensed care facilities had already been established as tax-exempt, the apartments were a new addition to the complex and had not yet been evaluated. *Id.* We accepted the Tax Tribunal's finding that the apartment building was not entitled to tax exemption merely by virtue of its association with the tax-exempt properties, and, thus, had to be examined separately. See *id.* at 346 n 9.

We then looked closely at how the apartment component of the complex was operated and found that the apartments differed little from the nursing home in *Michigan Baptist*, *supra*, that was not tax-exempt. We observed the Tax Tribunal's findings that residents were admitted "on the basis of their health and ability to pay the monthly fee," which contradicted the petitioner's articles of incorporation. *Id.* We also noted the tribunal's finding that "the apartments were merely 'a method whereby [the apartment] residents assure themselves a bed in a nursing home upon becoming disabled' and 'a convenient method of keeping a ready supply of prospective nursing home and old age home residents on hand'." *Id.*

It was unclear whether the apartments were profitable, but we took care to note the juxtaposing propositions that while "[a] corporation does not qualify for a tax exemption merely because it is structured to be nonprofit and in fact makes no profit," "[b]y the same token, a nonprofit corporation will not be disqualified for a charitable exemption because it charges those who can afford to pay for its services as long as the charges approximate the cost of the services." *Id.* at 350 n 15, citing *Michigan Sanitarium*, *supra* at 683; *Auditor General*, *supra* at 39; and

17

*Gull Lake Bible Conference Ass'n v Ross Twp*, 351 Mich 269; 88 NW2d 264 (1958). We noted that apartment residents who became unable to pay the monthly fee were relocated into areas of the retirement homes' complex that would entitle them to government assistance, which, consequently, lifted the petitioner's burden of charity. *Id.* at 345-346.

Commencing our legal analysis, we first sought the meaning of "charity." *Id.* at 348. We noted the proposition pronounced in our past cases that "to qualify for a charitable or benevolent tax exemption, property must be used in such a way that it 'benefit[s] the general public without restriction'." *Id.* at 348, quoting *Michigan Baptist*, *supra* at 671, and citing *Auditor General*, *supra* at 38. Surveying case law from other jurisdictions, we also took note of a widely used definition that seemed to restate and elaborate on that principle, and which similarly seemed to have stood the test of time:

> "[Charity] * * * [is] a gift, to be applied consistently with existing laws, for the benefit of an indefinite number of persons, either by bringing their minds or hearts under the influence of education or religion, by relieving their bodies from disease, suffering or constraint, by assisting them to establish themselves for life, or by erecting or maintaining public buildings or works or otherwise lessening the burdens of government." [*Id.* at 348-349, quoting *Jackson v Phillips*, 96 Mass (14 Allen) 539 (1867) (emphasis deleted; alterations in original).]

As such, we framed the pertinent question as follows: "Does Retirement Homes operate the apartments in such a way that there is a 'gift' for the benefit of 'the general public without restriction' or 'for the benefit of an indefinite number

of persons'?" *Id.* at 349. In light of the particular facts of the case, we concluded in the negative and explained our reasoning as follows:

> [T]here is no "gift" for the benefit of an indefinite number of persons or for the benefit of the general public without restriction in the operation of the apartments. The monthly fee is designed to cover all operating costs as well as to recover the construction costs of the apartments. While it does not appear that the apartments are operated for a profit, neither does it appear that the residents receive any significant benefit that they do not pay for. There is no "gift" to the residents.
>
> The operation of the apartments does not appear to benefit the general public. Its residents are chosen on the basis of their good health, their ability to pay the monthly charge, and, generally, their ability to live independently. [*Id.* at 349-350.]

Most recently, we applied the charitable institution microscope to an environmental organization engaged in conservation efforts, the promotion of natural resource management, and the protection of the rights of citizens to bear arms. *Michigan United Conservation Clubs*, *supra* at 665. To further these goals, the petitioner conducted or sponsored educational seminars and courses, published informational brochures, maintained a library, conducted lobbying, and administered a fund to oppose any movement to restrict gun ownership. *Id.* at 666-667. Restating the definition of charity set forth in *Retirement Homes*, *supra*, we concluded that the petitioner was not a charitable institution, although we rejected the Court of Appeals exclusive focus on the petitioner's lobbying activities. *Id.* at 673. And while we agreed that the petitioner did provide some services that could be deemed charitable gifts, we found that, on balance, the petitioner was organized to benefit its paying members rather than to benefit "the

19

general public without restriction" or "for the benefit of an indefinite number of persons." *Id.* at 673.

Several common threads can be found in this line of cases. First, it is clear that the institution's activities as a whole must be examined; it is improper to focus on one particular facet or activity. In that sense, the inquiry pertains more to whether an institution could be considered a "charitable" one, rather than whether the institution offers charity or performs charitable work. So it is the overall nature of the institution, as opposed to its specific activities, that should be evaluated.

A second indispensable principle is that the organization must offer its charitable deeds to benefit people who need the type of charity being offered. In a general sense, there can be no restrictions on those who are afforded the benefit of the institution's charitable deeds. This does not mean, however, that a charity has to serve every single person regardless of the type of charity offered or the type of charity sought. Rather, a charitable institution can exist to serve a particular group or type of person, but the charitable institution cannot discriminate within that group. The charitable institution's reach and preclusions must be gauged in terms of the type and scope of charity it offers.

From these precepts, it naturally follows that each case is unique and deserving of separate examination. Consequently, there can be no threshold imposed under the statute. The Legislature provided no measuring device with which to gauge an institution's charitable composition, and we cannot presuppose

20

the existence of one. To say that an institution must devote a certain percentage of its time or resources to charity before it merits a tax exemption places an artificial parameter on the charitable institution statute that is unsanctioned by the Legislature.

The Tax Tribunal and the Court of Appeals focused exclusively on the dollar amount of free health care petitioner gifted as part of its charity care program, looking no further into the nature of petitioner's organization. This was error because it is clear that both tribunals had in mind a monetary threshold that is not only not discernable from the statute, but that would be, by its very nature, quite arbitrary.

As petitioner aptly pointed out, there are multiple reasons why inventing legislative intent in this regard would be ill-advised and most unworkable. In fact, the difficulties with formulating a monetary threshold illuminate why setting one is the Legislature's purview, not the courts'. To set such a threshold, significant questions would have to be grappled with. For instance, a court would have to determine how to account for the indigent who do not identify themselves as such but who nonetheless fail to pay. A court would have to determine whether facilities that provide vital health care should be treated more leniently than some other type of charity because of the nature of its work, or even if a health care provider in an underserved area, such as petitioner, is more deserving of exemption than one serving an area of lesser need. A court would need to consider whether to premise the exemption on whether the institution had a

21

surplus and whether providing below-cost care constitutes charity. Clearly, courts are unequipped to handle these and many other unanswered questions. Simply put, these are matters for the Legislature.

We conclude that the definition set forth in *Retirement Homes*, *supra* at 348-349, sufficiently encapsulates, without adding language to the statute, what a claimant must show to be granted a tax exemption as a charitable institution:

> "[Charity] * * * [is] a gift, to be applied consistently with existing laws, for the benefit of an indefinite number of persons, either by bringing their minds or hearts under the influence of education or religion, by relieving their bodies from disease, suffering or constraint, by assisting them to establish themselves for life, or by erecting or maintaining public buildings or works or otherwise lessening the burdens of government." [*Id.*, quoting *Jackson v Phillips*, 96 Mass (14 Allen) 539 (1867) (emphasis deleted; alterations in original).]

In light of this definition, certain factors come into play when determining whether an institution is a "charitable institution" under MCL 211.7o and MCL 211.9(a). Among them are the following:

(1) A "charitable institution" must be a nonprofit institution.

(2) A "charitable institution" is one that is organized chiefly, if not solely, for charity.

(3) A "charitable institution" does not offer its charity on a discriminatory basis by choosing who, among the group it purports to serve, deserves the services. Rather, a "charitable institution" serves any person who needs the particular type of charity being offered.

22

(4) A "charitable institution" brings people's minds or hearts under the influence of education or religion; relieves people's bodies from disease, suffering, or constraint; assists people to establish themselves for life; erects or maintains public buildings or works; or otherwise lessens the burdens of government.

(5) A "charitable institution" can charge for its services as long as the charges are not more than what is needed for its successful maintenance.

(6) A "charitable institution" need not meet any monetary threshold of charity to merit the charitable institution exemption; rather, if the overall nature of the institution is charitable, it is a "charitable institution" regardless of how much money it devotes to charitable activities in a particular year.

Examining petitioner under these factors, we find that it is a charitable institution. Petitioner's medical clinic is readily distinguishable from the entities that we have found nonexempt under MCL 211.7o. Petitioner is not only organized as a charitable institution as reflected in its statement of purpose and its bylaws, but it devotes itself to charitable works on the whole. We instructed in *Attorney General v Common Council of Detroit*, *supra* at 390, that an institution must be "organized chiefly, if not solely" for charity, and petitioner meets this test. Respondent has pointed to no other reason for petitioner's existence. Nor has respondent shown any evidence that petitioner is not actively pursuing its mission to the exclusion of any noncharitable activities. We find these omissions telling.

Petitioner is also fundamentally different from the Hillside Terrace home for the aged in *Michigan Baptist*, *supra,* and the apartment complex in *Retirement*

23

*Homes*, *supra*. In both of those cases, the cost of maintaining the institutions was covered by fees collected from the residents. Prospective residents whose health or financial status did not meet strict requirements were not accepted. And although the petitioner in *Michigan Baptist* made some small exceptions in that regard, the general rule was of an exclusionary nature, not a charitable one.

Petitioner in the present case shares no similarities with those institutions. Petitioner has a charity care program that offers free and reduced-cost medical care to the indigent with no restrictions. It operates under an open-access policy under which it accepts any patient who walks through its doors,[9] with preferential treatment given to no one. Although petitioner sustains notable financial losses by not restricting the number of Medicare and Medicaid patients it accepts, it bears those losses rather than restricting its treatment of patients who cannot afford to pay.

Petitioner more closely matches the hospitals examined in *R B Smith*, *supra*, and *Michigan Sanitarium*, *supra*, hospitals we found qualified for the charitable institution exemption. Just as in those cases, the overall nature of petitioner's organization is charitable. The losses the institution sustains are not fully subsidized by the patients, but by petitioner's parent corporations, patients

---

[9] Petitioner's agent did explain that it must occasionally turn away patients who have destroyed the physician-patient relationship by exhibiting violence, being dishonest to the detriment of petitioner's ability to treat them, or engaging in drug-seeking behavior. We find those exceptions to petitioner's general rule to be well-justified and, thus, to have no effect on petitioner's status as a charitable institution.

24

who can afford to pay, and, to some extent, by government reimbursements. And the fact that petitioner receives government reimbursements has little bearing on the analysis because, despite any government aid, the beneficiary of the medical care receives a gift. See, e.g., *Huron Residential Services v Pittsfield Charter Twp*, 152 Mich App 54; 393 NW2d 568 (1986) (holding that a petitioner who received approximately 99 percent of its revenues from state funding was a charitable institution because the residents did not pay full value for the services rendered and, thus, received a charitable gift from the petitioner). See also *Retirement Homes*, *supra* at 350 n 15 ("[A] nonprofit corporation will not be disqualified for a charitable exemption because it charges those who can afford to pay for its services as long as the charges approximate the cost of the services.").

Moreover, it is clear in this case that the reimbursements petitioner receives from government funding fall well short of defraying the costs petitioner incurs to render medical care. Thus, not only are Medicare and Medicaid patients receiving a gift from petitioner, but petitioner is not fully recouping its costs from the government because of the government's underpayments.

Respondent argues that petitioner's goal of profitability negates its claim that it is a charitable institution. We find that argument hollow. Petitioner's bylaws do not allow any individual to profit monetarily from the petitioner's clinic; thus, "profitability" has a different meaning for this institution than it would for an entity whose goal it was to reward its agents or shareholders with profits. And the idea that an institution cannot be a charitable one unless its losses exceed

its income places an extraordinary—and ultimately detrimental—burden on charities to continually lose money to benefit from tax exemption. A charitable institution can have a net gain—it is what the institution does with the gain that is relevant. See *R B Smith Mem Hosp*, *supra* at 36, 41 (1940). When the gain is invested back into the institution to maintain its viability, this serves as evidence, not negation, of the institution's "charitable" nature.

Nor can credence be given to respondent's argument that petitioner is not "charitable" because it is not open 24 hours a day or because it includes noncompetition clauses in its physicians' contracts. Taken alone, these are merely neutral facts, and whether they gain or lose relevance depends on their importance when considered as part of the broader picture. In the totality of petitioner's circumstances, we do not find them particularly meaningful. First, just as there is no monetary threshold by which we can gauge an institution's charity, there is certainly no rule requiring a charity to never sleep. Petitioner holds regular business hours, and during those hours, it accepts any patient who needs medical care. And with respect to the noncompetition clauses, petitioner explained that it is very difficult to attract physicians to the region, so these clauses are included to encourage physicians to remain with the charity and assist petitioner with carrying out its charitable work. Moreover, petitioner's agent testified that petitioner has never enforced one of its noncompete clauses. Thus, these facts do nothing to reduce petitioner's charitable status.

Respondent also unconvincingly argues that petitioner does not "lessen the burden of government," see *Retirement Homes*, *supra* at 349, because it enlists eligible patients in government-subsidized programs. While "lessening the burden of government" is a component of the definition of "charity" found in *Retirement Homes*, *supra*, respondent takes it out of context. This Court stated that a charitable institution is one that benefits an indefinite number of persons "'either by bringing their minds or hearts under the influence of education or religion, by relieving their bodies from disease, suffering or constraint, by assisting them to establish themselves for life, or by erecting or maintaining public buildings or works or *otherwise* lessening the burdens of government.'" *Id.* (emphasis added; citation omitted). Implicit in the definition is that relieving bodies from disease or suffering *is* lessening the burden of government. In other words, petitioner does not have to prove that its actions lessen the burden of government. Rather, it has to prove, as it did, that it "reliev[es] their bodies from disease, suffering or constraint," which is, by its nature, a lessening of the burden of government. In any event, even though petitioner helps to enroll patients in Medicare and Medicaid, it still subsidizes the cost of care in light of the government's underpayment, thus lessening the government's burden of covering the full cost of a person's care.

Finally, we reject the reliance of the lower tribunals and respondent on *ProMed*, *supra*. The Court of Appeals holding in that case was directly tied to its finding that the petitioner had presented *no* documentation of the level of

27

charitable service it provided.  The Court of Appeals was correct to hold that when an institution presents no evidence of its charitable works, then, as a matter of law, it cannot be found to be a charitable institution.  But it does not follow that an institution must present evidence of a *particular* level of charitable care because there is no such threshold level contained in the statute.  And we refuse to create one.  Accordingly, *ProMed* must not be interpreted as requiring quantitative proof of the *value* of charitable care.  Rather, the focus should be on the overall nature of the institution as judged by the particular facts presented in each individual case.[10]

In sum, the Tax Tribunal and Court of Appeals erred by denying petitioner's request for tax exemption as a charitable institution.   Petitioner satisfies the concepts we have previously set forth with respect to what a claimant must show to be found "charitable."  See *Retirement Homes*, *supra* at 348-349.

---

[10] The *ProMed* Court also reasoned that to allow ProMed a charitable exemption, it "would in effect be granting tax exempt status to every doctor's office in the state, as well as every organization offering health-related services, as long as those organizations are structured as nonprofit corporations and maintain policies of offering some 'appropriate' level of charity medical care to indigent persons."  *ProMed*, *supra at* 500-501.  We reject that reasoning for two reasons.  Most importantly, the Court inappropriately based its statement on its subjective fear of the outcome of applying the clear statutory language, rather than simply applying the language of the statute itself, which says nothing about an "appropriate" level of care.  And even if the Court's concern were relevant, we find it somewhat overblown in that it is doubtful that any significant number of profitable medical institutions would forgo their for-profit status in exchange for property tax exemption.  In any event, the charitable institution exemption has been in place for over 100 years, and we discern no sign of rampant abuse of it.  Nor, apparently, has the Legislature because it has not altered the exemption in any significant way since we first interpreted it in 1897.

Petitioner provides a gift—free or below-cost health care—to an indefinite number of people by relieving them of disease or suffering.

As such, while we will generally "defer to the Tax Tribunal's interpretation of a statute that it is delegated to administer," *Maxitrol Co v Dep't of Treasury*, 217 Mich App 366, 370; 551 NW2d 471 (1996), we decline to do so in this case because we find that the tribunal misinterpreted the law. The statute says nothing about how much "charity" an institution should provide. Despite that, the tribunal erroneously engrafted a nonexistent threshold of charitable activity. Had the Legislature wanted such a threshold, it could have easily included one. Therefore, we find that petitioner is a charitable institution entitled to the corresponding tax exemption.

## B. "PUBLIC HEALTH PURPOSE"

Petitioner also argued that it was entitled to the exemption offered under MCL 211.7r to organizations serving a "public health purpose." Because we find that petitioner is exempt as a charitable institution under MCL 211.7o, there is no need to delve any further. Thus, we leave further examination of the meaning of "public health purpose" for another day. We do, however, vacate the part of the Court of Appeals judgment that held that petitioner did not qualify for this exemption.

## IV. CONCLUSION

Whether an institution is a charitable institution within the meaning of MCL 211.7o is a fact-specific question that requires examining the claimant's

29

overall purpose and the way in which it fulfills that purpose. The determination will rarely, if ever, rest on one specific fact, such as the percentage of monetary value of services given for free. Because the Tax Tribunal and the Court of Appeals misapplied existing law by erroneously narrowing the focus of their inquiry to the value of the free medical care petitioner rendered in the given tax years, they erroneously denied the requested exemption. Petitioner is a charitable institution because it exists for, and carries out, the purpose of giving a gift for the benefit of an indefinite number of persons by providing free and below-cost medical care to anyone who needs it without qualification, and it realizes no pecuniary gain from its activities. As such, it is entitled to an ad valorem tax exemption.

We reverse the part of the Court of Appeals judgment that held that petitioner was not a charitable institution. We further vacate the part of its judgment pertaining to whether petitioner served a public health purpose. We remand this case to the Tax Tribunal for entry of judgment for petitioner.

> Michael F. Cavanagh
> Clifford W. Taylor
> Elizabeth A. Weaver
> Marilyn Kelly
> Maura D. Corrigan
> Robert P. Young, Jr.
> Stephen J. Markman