# STATE OF MICHIGAN

# COURT OF APPEALS

HARMONY MONTESSORI CENTER,

      Plaintiff-Appellant,

v

CITY OF OAK PARK,

      Defendant-Appellee.

UNPUBLISHED
October 13, 2016

No. 326870
Tax Tribunal
LC No. 00-370214

Before: TALBOT, C.J., and O'CONNELL and OWENS, JJ.

PER CURIAM.

In this property tax matter, petitioner, Harmony Montessori Center (Harmony), appeals as of right the tax tribunal's determination that it is not entitled to the educational institution exemption[1] or the charitable institution exemption[2] found in the General Property Tax Act (GPTA).[3] We affirm.

## I. FACTS

Harmony, a nonprofit, 501(C)(3) corporation, offers preschool and kindergarten programs to students age 6 and younger. Harmony utilizes a Montessori-style education system. Harmony employs teachers specially trained in this style of education. Classrooms have students of different ages, and multiple teachers are assigned to each classroom. Students pursue what are generally considered advanced subject matters considering the children's ages. Rather than focus on grade level, Harmony focuses on each child's own skill set and abilities. Harmony also charges tuition for its various programs. Full-day programs generally cost in the range of $7,000 to $8,000 annually.

In 2009, respondent, the City of Oak Park (the City), assessed ad valorem property taxes against Harmony. Harmony protested the assessment, contending that it was entitled to the

---

[1] MCL 211.7n.

[2] MCL 211.7o.

[3] MCL 211.1 et seq.

educational institution and charitable institution exemptions. In September, 2012, after competing motions for summary disposition were filed by the parties, the tribunal granted summary disposition in the City's favor. Based on stipulated facts presented by the parties, the tribunal determined that Harmony was not entitled to the educational institution exemption because it did not substantially alleviate the state's educational burden. The tribunal determined that Harmony was not a charitable organization because it charged tuition to the vast majority of students and offered reduced pricing to only a few.

On appeal, this Court reversed and remanded, concluding that a question of fact existed with respect to Harmony's entitlement to both exemptions.[4] With respect to the educational institution exemption, this Court explained that the tribunal erred by "fail[ing] to consider the children who were enrolled in [Harmony]'s preschool program that would and could have attended the Great Start Readiness Program [(GSRP)], and that would and could have attended a state-funded kindergarten program, even though they were enrolled in a Montessori preschool program."[5] With regard to the charitable institution exemption, this Court found that the tribunal misapplied the factors stated in *Wexford Med Group v City of Cadillac*.[6]

On remand, the tribunal conducted an evidentiary hearing. After the hearing, the tribunal again concluded that Harmony was not entitled to either tax exemption. With regard to the educational institution exemption, the tribunal found that a limited number of Harmony's students could possibly attend a state-funded program. However, the tribunal concluded that in the absence of Harmony, these children would attend another Montessori-style program rather than enroll in a state-funded program. Thus, the tribunal concluded that Harmony did not relieve a substantial governmental burden and was not entitled to the educational institution exemption.

With regard to the charitable institution exemption, the tribunal focused on this Court's statement that if a budget "deficit is to be made up by those receiving the services, [Harmony] would not be charitable . . . ."[7] Harmony's co-director and administrator, Anna Fast, testified that Harmony operated at a loss in some years.[8] She explained that when this occurred, Harmony would raise tuition in the following year to make up the difference. From this testimony, the tribunal determined that because losses were to be made up by those receiving Harmony's services, Harmony was not a charitable institution. Harmony now appeals.

---

[4] *Harmony Montessori Ctr v Oak Park*, unpublished opinion per curiam of the Court of Appeals, issued February 18, 2014 (Docket No 312856), unpub op at 6.

[5] *Id*. at 2. As is discussed later in this opinion, a number of Harmony's students, while old enough to attend a state-funded kindergarten program, have chosen to continue in Harmony's preschool program.

[6] *Wexford Med Group v City of Cadillac*, 474 Mich 192, 215; 713 NW2d 734 (2006).

[7] *Harmony Montessori Ctr*, unpub op at 5 (Docket No. 312856).

[8] In other years, Harmony operated at a net profit. These profits were used to pay for facility improvements.

## II. STANDARD OF REVIEW

As this Court has explained:

> Review of a decision by the [tribunal] is very limited. In the absence of fraud, error of law or the adoption of wrong principles, no appeal may be taken to any court from any final agency provided for the administration of property tax laws from any decision relating to valuation or allocation. The tribunal's factual findings will not be disturbed as long as they are supported by competent, material, and substantial evidence on the whole record. Substantial evidence must be more than a scintilla of evidence, although it may be substantially less than a preponderance of the evidence. The appellant bears the burden of proof in an appeal from an assessment, decision, or order of the Tax Tribunal.[9]

## III. EDUCATIONAL INSTITUTION EXEMPTION

Under the GPTA, "all property, real and personal, within the jurisdiction of this state, not expressly exempted, shall be subject to taxation."[10] But our Legislature has exempted "[r]eal estate and personal property owned and occupied by" an "educational . . . institution[]" from taxation under the GPTA,[11] and Harmony contends that it is entitled to this exemption. The relevant question in this appeal is whether Harmony qualifies as an educational institution. To be an educational institution, and thus, entitled to the exemption, the institution must make "a substantial contribution to the relief of the burden of government."[12] An institution makes such a contribution if "a substantial portion" of the institution's students both could and would attend a state-supported school if the institution did not exist.[13] In other words, if an institution "is educating students qualified and willing to attend" a state-funded school that provides similar educational programs, in both quality and quantity, then the institution "is assuming a portion of the burden of educating the student which otherwise falls on tax-supported schools."[14]

In this matter, the evidentiary record demonstrated that only a relatively small portion of Harmony's students could possibly attend a state-funded school or program. Generally, a child must be 5 years of age to attend a state-funded kindergarten program.[15] In the years 2008

---

[9] *Drew v Cass Co*, 299 Mich App 495, 498-499; 830 NW2d 832 (2013) (quotation marks and citations omitted).

[10] MCL 211.1.

[11] MCL 211.7n.

[12] *Ladies Literary Club v Grand Rapids*, 409 Mich 748, 755-756; 298 NW2d 422 (1980).

[13] See *David Walcott Kendall Mem Sch v Grand Rapids*, 11 Mich App 231, 240; 160 NW2d 778 (1968).

[14] *Id*.

[15] More specifically, under the version of the statute in place during the time period at issue in this matter, a child must have turned five years old by December 1 of the school year of

through 2012, Harmony's programs were available to students 18 months old to 6 years of age.[16] The evidence introduced at the hearing demonstrated over the course of these years, a total of 175 students were enrolled at Harmony. Of these, 47 were old enough to be eligible to attend a state-funded kindergarten program. In addition, a total of two students may have been able to enroll in a state-funded GSRP.[17] Thus, and as Harmony acknowledges, only a small percentage of its students could possibly have attended a state-funded preschool or kindergarten program.

The tribunal further concluded from the record before it that if Harmony were to cease to exist, the limited number of students who might be able to attend a state-funded program would not do so, and rather, would attend another Montessori program. We conclude that this factual finding was based on substantial evidence. The record established that only 23 of Harmony's students elected to participate in its kindergarten program in the years 2008 through 2012. The remainder apparently chose to continue in Harmony's preschool program rather than begin kindergarten. This demonstrated that the parents of a substantial number of students that could attend state-funded kindergarten elected not to do so. The record also established the various unique qualities of the Montessori method of education utilized by Harmony. Parents of Harmony's students clearly have chosen to pay a substantial amount of tuition so that their children may attend Harmony's unique program rather than attend a public school. It is no leap of logic to conclude from this record that those parents who might be able to enroll their children in a state-funded kindergarten or prekindergarten program would not do so, and rather, would seek out a similar Montessori-style educational program were it not for Harmony's existence.

Harmony contends that the tribunal erred by emphasizing educational technique rather than examining the coursework provided by Harmony and comparing that to what is available in state-funded programs. In *David Walcott Kendall Mem Sch*, this Court stated several factors to be applied when presented with the question of whether students could and would attend a state-supported school: "the requirements for admission to the school seeking exemption, the qualifications of the student, the major field of study undertaken by the student, the time necessary to complete the prescribed course of study, and the comparative quality and quantity

---

enrollment. See MCL 380.1147(2), as enacted by 2012 PA 198. Currently, students must be five years old on September 1 of the year of enrollment. MCL 380.1147(2).

[16] During the 2010-2011 school year, Harmony also offered a "wobbler" program for students 12 to 17 months of age. Four students were enrolled in that program.

[17] The GSRP provides state-funded preschool for children at least four but less than five years of age. MCL 388.1632d(1). Great Start generally requires that at least 90% of children participating in the program come from a household earning less than or equal to 250% of the federal poverty level. MCL 388.1632d(5)(b). Thus, Great Start gives priority enrollment to children coming from households with incomes furthest below 250% of the federal poverty level. MCL 388.1632d(11). The program also prioritizes children with educational risk factors such as diagnosed disabilities or exposure to abuse. Michigan Department of Education, *Great Start Readiness Program Participant Eligibility and Prioritization Guidelines* < http://www.michigan.gov/documents/mde/Eligibility_Flow_Chart_297910_71_408476_7.pdf > (accessed October 6, 2016).

of the courses offered by the school to the same programs at the State colleges and universities."[18]  As one may quickly realize from reading these factors, the issue in *David Walcott Kendall Mem Sch* did not involve a preschool or kindergarten program; rather, it was whether a post-secondary school of design substantially relieved the burden of government in funding public universities.[19]  Thus, and as Harmony recognizes, these factors must be tailored to account for the circumstances placed before the tribunal in this matter.[20]  One factor is the "comparative quality and quantity of the courses offered by the school . . . ."[21]  Harmony does not offer "courses," it offers different programs.  In this matter, the methodology utilized by Harmony in conducting these programs is relevant to the question of the quality of the programs.  Thus, we discern no error from the tribunal's emphasis on Harmony's teaching methods and techniques as compared to those utilized in state-funded programs.[22]

Harmony argues that the tribunal should have considered an indirect benefit created by Harmony.  Harmony contends that its programs better prepare students for success in the future, thus lessening the chances that these students will need remedial education once in the public school system.  While perhaps plausible, this inquiry does not address the relevant legal analysis, which is to ask whether Harmony's students would attend a state-funded school if Harmony did not exist.[23]  The question is where the students would attend school at present, not whether there is a possibility of a benefit to the state in the future.  The tribunal did not misapply the law or adopt a wrong principle by failing to credit this argument.[24]

Harmony contends that the tribunal erred by ignoring testimony from Karen King, who testified that she believed approximately 75% of Harmony's students go on to enroll in public

---

[18] *David Walcott Kendall Mem Sch v Grand Rapids*, 11 Mich App 231, 240; 160 NW2d 778 (1968).

[19] *Id*.

[20] For example, children of the ages that attend Harmony do not have a "major field of study," rendering this factor fairly irrelevant.

[21] *Id*.

[22] In a similar vein, Harmony contends that the tribunal engaged in an improper subjective analysis rather than what it believes is an objective analysis created by *David Walcott Kendall Mem Sch*.  We disagree, for the simple reason that the factors stated in *David Walcott Kendall Mem Sch* are not entirely objective.  Under *David Walcott Kendall Mem Sch*, the tribunal is to consider the "comparative quality" of courses offered by one school over another, an indisputably subjective inquiry.  *Id*.

[23] *Id*.

[24] In any event, this argument was premised on testimony from Karen King, who, without any data or other evidence supporting her opinion, simply asserted that Harmony's students were more likely to succeed in elementary school and less likely to require remedial services.  We doubt whether this could be considered substantial evidence on which the tribunal could base a decision.

elementary schools. If true, the testimony would at least demonstrate a willingness on the part of parents to enroll their children in a state-funded school. But King's testimony was far from conclusive. Rather, when asked how many of Harmony's students went on to public schools, King testified that she was unsure, and "would guess that it's 75[%]." She explained that Harmony had never studied the question. Without any support for her admitted guess, it is difficult to fault the tribunal for failing to address this testimony or, more importantly, to reach an opposite conclusion. And in any event, our task as a reviewing court is not to substitute our view of the record for that of the tribunal.[25] Rather, our task is to determine whether the tribunal's factual findings were supported by substantial evidence. "A court will not set aside findings merely because alternative findings also could have been supported by substantial evidence."[26]

Harmony raises a variety of additional arguments, which we have considered, and find lacking in merit. Ultimately, with respect to the educational institution exemption, the tribunal did not make an error of law or apply a wrong principle. Based on its review of the factual record placed before it, the tribunal concluded that Harmony failed to demonstrate that a substantial portion of its students both could and would attend a state-funded program if Harmony ceased to exist. Because the tribunal's factual findings are supported by substantial evidence, we affirm the tribunal's conclusion that Harmony is not entitled to the educational institution exemption.

## IV. CHARITABLE INSTITUTION EXEMPTION

Whether Harmony is entitled to the charitable institution exemption provided by MCL 211.7*o* depends on the application of the principles explained in *Wexford*. In *Wexford*, after analyzing several earlier cases, our Supreme Court stated the following:

> We conclude that the definition set forth in *Retirement Homes* [*of the Detroit Annual Conference of the United Methodist Church, Inc v Sylvan Twp*, 416 Mich 340, 348-349; 330 NW2d 682 (1982)], sufficiently encapsulates, without adding language to the statute, what a claimant must show to be granted a tax exemption as a charitable institution:
>
> > "[Charity] . . . [is] a gift, to be applied consistently with existing laws, for the benefit of an indefinite number of persons, either by bringing their minds or hearts under the influence of education or religion, by relieving their bodies from disease, suffering or

---

[25] See *Ann Arbor Bank and Trust Co v Francis*, 85 Mich App 131, 137-138; 270 NW2d 725 (1978) (under the "substantial evidence" standard of review, an appellate court should not "substitut[e] a new judgment as to the facts[]" because the fact-finder "observes the witness testifying" and has a "superior position and a better vantage point and opportunity to draw these conclusions than he or she who has only a written record to review.").

[26] *In re Payne*, 444 Mich 679, 692; 514 NW2d 121 (1994).

constraint, by assisting them to establish themselves for life, or by erecting or maintaining public buildings or works or otherwise lessening the burdens of government." [*Id.*, quoting *Jackson v Phillips*, 96 Mass (14 Allen) 539 (1867) (emphasis deleted; alterations in original).]

In light of this definition, certain factors come into play when determining whether an institution is a "charitable institution" under MCL 211.7o and MCL 211.9(a). Among them are the following:

(1) A "charitable institution" must be a nonprofit institution.

(2) A "charitable institution" is one that is organized chiefly, if not solely, for charity.

(3) A "charitable institution" does not offer its charity on a discriminatory basis by choosing who, among the group it purports to serve, deserves the services. Rather, a "charitable institution" serves any person who needs the particular type of charity being offered.

(4) A "charitable institution" brings people's minds or hearts under the influence of education or religion; relieves people's bodies from disease, suffering, or constraint; assists people to establish themselves for life; erects or maintains public buildings or works; or otherwise lessens the burdens of government.

(5) A "charitable institution" can charge for its services as long as the charges are not more than what is needed for its successful maintenance.

(6) A "charitable institution" need not meet any monetary threshold of charity to merit the charitable institution exemption; rather, if the overall nature of the institution is charitable, it is a "charitable institution" regardless of how much money it devotes to charitable activities in a particular year.[27]

When this Court remanded the matter to the tribunal, it did so with the following directive:

Consequently, the fact that petitioner charges for its services does not necessarily preclude it from being a "charitable institution." *Conversely, the fact that an institution may be operating at a loss at any given point in time does not automatically make it charitable; if the deficit is to be made up by those receiving the services, it would not be charitable*, whereas if the deficit is *not* being made up by those receiving the services, it might be. *Wexford*, 474 Mich at 207-209,

---

[27] *Wexford*, 474 Mich at 214-215.

217. It appears from the record so far developed that any member of the public may obtain from petitioner more education than they are, strictly speaking, paying for. We conclude, therefore, that petitioner has established a genuine question of material fact whether it is a charitable institution.[28]

In its opinion on remand, the tribunal understandably focused on testimony regarding tuition increases. Fast explained that each time Harmony finished a year at a financial loss, it increased tuition in the following year to make up the difference. Thus, the record demonstrated that indeed, deficits were made up by those receiving Harmony's services. Once this fact was established, this Court's prior opinion required the tribunal to conclude that Harmony was not entitled to the charitable institution exemption.[29] Thus, we can find no legal error or application of a wrong principle in the tribunal's analysis. Because the tribunal's factual findings are supported by substantial evidence, we must affirm the tribunal's conclusion that Harmony is not entitled to the charitable institution exemption.

## V. RESPONSE TO THE DISSENT

The dissent finds Harmony similar to the petitioner in *Wexford* for two reasons: (1) Harmony offered reduced tuition in some circumstances, and (2) Harmony "holds fundraisers and accepts donations." We find the comparison unavailing. The petitioner in *Wexford* had "a charity care program that offer[ed] free and reduced-cost medical care to the indigent with no restrictions."[30] The petitioner "sustain[ed] notable financial losses by not restricting the number of Medicare and Medicaid patients it accept[ed]," but bore "those losses rather than restricting its treatment of patients who cannot afford to pay."[31] The petitioner's losses were "not fully subsidized by the patients, but by [the] petitioner's parent corporations, patients who can afford to pay, and, to some extent, by government reimbursements."[32] It is true that Harmony offered reduced rates to a few students. But the record established that this was a very rare occurrence. Since 1998, out of approximately 500 students to attend Harmony, 8 received tuition discounts due to financial need. Harmony never offered free tuition to a single student. Nor does Harmony have an established program offering need-based discounts to those who needed financial assistance.[33] And when Harmony did operate at a loss, those losses were not absorbed

---

[28] *Id*. (footnote omitted; some emphasis supplied).

[29] *Harmony Montessori Center*, unpub op at 5 (Docket No. 312856). It is true that Harmony derived some revenue from donations and one fundraising effort. However, this revenue went toward extraordinary expenses, such as facility improvements, not the funding of day-to-day operations.

[30] *Wexford*, 474 Mich at 216.

[31] *Id*. at 216-217.

[32] *Id*. at 217.

[33] Further, according to King, Harmony is aware of "several families where the grandparent has stepped up and paid for the child's tuition or they have gotten other sources of income to pay just a[]part of the child's tuition so they could afford to attend." If Harmony had any sort of regular

by Harmony, nor were they covered by fundraising and donations.[34]  Rather, the losses were passed directly to the parents of Harmony's students, through increased tuition rates the following year.  Ultimately, the petitioner in *Wexford* was a charity because it "provide[d] a gift—free or below-cost health care—to an indefinite number of people . . . ."[35]  In contrast, virtually every student at Harmony pays the full cost of the education they receive.  On the whole, Harmony bears very little resemblance to the petitioner in *Wexford*.

The dissent concludes that the tribunal "adopted a wrong principle when it based its decision . . . solely on the fact that Harmony charges tuition and fees."  We respectfully disagree.  The tribunal's decision was based on how Harmony *uses* tuition, and specifically, that it uses tuition increases to make up budget deficits.  This demonstrated that Harmony's purpose is not to provide charity, i.e, a gift, but rather, to provide a service to those willing to pay for it.  And in any event, as we have explained, this Court's prior decision compelled the result reached by the tribunal.  Again, we cannot conclude that the tribunal adopted a wrong principle when it followed this Court's explicit directive.

Affirmed.

/s/ Michael J. Talbot
/s/ Donald S. Owens

---

practice of offering free or discounted tuition, one might ask why it did not convey this information to these families.

[34] Harmony did receive donations on occasion, and held one fundraiser.  However, the income derived from these sources went toward extraordinary expenses, such as facility improvements, not Harmony's day-to-day operations.  Harmony's regular operations are indeed funded solely through tuition paid by parents, not fundraisers or donations.

[35] *Wexford*, 474 Mich at 220-221.