# STATE OF MICHIGAN

# COURT OF APPEALS

CHELSEA HEALTH & WELLNESS
FOUNDATION,

        Petitioner-Appellant/Cross-
        Appellee,

v

TOWNSHIP OF SCIO,

        Respondent-Appellee/Cross-
        Appellee,

and

CITY OF DEXTER and DEXTER DOWNTOWN
DEVELOPMENT AUTHORITY,

        Intervening Respondents-
        Appellees/Cross-Appellants,

and

DEPARTMENT OF TREASURY,

        Intervening Respondent-
        Appellee/Cross-Appellee/Cross-
        Appellant.

UNPUBLISHED
October 12, 2017

No. 332483
Michigan Tax Tribunal
LC No. 14-001671-TT

Before: TALBOT, C.J., and O'CONNELL and O'BRIEN, JJ.

PER CURIAM.

At issue in this case is an order of the Michigan Tax Tribunal denying petitioner Chelsea Health and Wellness Foundation's (the Foundation) request for exemption from ad valorem property taxes under Section 7o(1) of the General Property Tax Act (GPTA), MCL 211.1, *et*

-1-

*seq.*, for the 2014 and 2015 tax years.[1] The Foundation also appeals as of right an order denying its alternative request for exemption under Section 7r and an order denying leave to amend its petition. We reverse that portion of the tribunal's order finding that the Foundation is not entitled to exemption under Section 7o(1) and remand this matter to the tribunal for entry of an order consistent with this opinion. In light of our conclusion that the Foundation qualifies for exemption under Section 7o(1), we need not address the remaining issues raised by the Foundation.

## I. FACTUAL BACKGROUND

In 2008, Chelsea Community Hospital merged with Saint Joseph Mercy Health System. As a condition of the merger, the Foundation was established as a nonprofit corporation and funded with $25 million to be used "in promoting health, wellness and fitness education, health care initiatives and other community-based activities" in the designated service area of Chelsea, Manchester, Stockbridge, Grass Lake, and Dexter. The Foundation's articulation of its mission is "[t]o create a culture of wellness and foster sustained improvements in the health of our communities through stewardship of our resources, innovative and collaborative grants, and engagement of our residents in the pursuit of healthy life choices." In furtherance of its mission, the Foundation focuses on four "elements": (1) eating better; (2) moving more; (3) avoiding unhealthy substances; and (4) connecting with others in health ways.

This matter arises from a dispute concerning the taxable status of the property on which the Foundation's Dexter Wellness Center (DWC) is situated. The DWC operates in a two-story, 46,000 square-foot building located in downtown Dexter.[2] The DWC includes amenities commonly found in full-service fitness facilities, including a gymnasium, two swimming pools, a group cycling room, exercise studios, free weights, a running track, circuit training equipment, a cardio area, and locker rooms. It also has a conference room on the first floor that is made available for community group meetings and various educational seminars sponsored by the Foundation. The DWC was certified as a medically-integrated facility in 2015 by the Medical Fitness Association.

---

[1] Briefs were received from amici Michigan Municipal League, Michigan Townships Association, Michigan Association of School Boards, Michigan Association of Counties, and Public Corporation Law Section of the State Bar of Michigan in support of Dexter. In support of the Foundation, briefs were received from amici Grass Lake Charter Township, Village of Grass Lake, Village of Manchester, Chelsea Wellness Coalition, Stockbridge Community Schools, Stockbridge Wellness Coalition, and Trinity Health Michigan, Inc., doing business as Saint Joseph Mercy Health System.

[2] Before the former village of Dexter incorporated to form the city of Dexter, Scio Township was responsible for assessing all real property located in the village of Dexter, including the subject property. The former village of Dexter incorporated to establish the city of Dexter in November 2014 and Scio Township has conceded that it does not have a financial interest in the outcome of this case.

The Foundation's chief executive officer, Amy Heydlauff, testified at length regarding the Foundation's history, activities, and two-part strategy involving community coalitions and wellness centers. The Foundation encouraged each of the five communities in its service area to establish wellness coalitions, comprised of community stakeholders who were familiar with the health needs of their respective communities. Each coalition develops an annual plan, identifying a number of "interventions" that are designed to address the community's health needs. These wellness plans are presented to the Foundation and, assuming the proposed interventions meet the Foundation's mission, the Foundation provides funds and other support to implement the interventions. Each of the five community coalitions were granted approximately $200,000 in funding for the first plan year and $100,000 in annual funding thereafter.

The Foundation's second key strategy involves operation of wellness centers in Dexter, Chelsea, Manchester, and Stockbridge. In addition to the exercise amenities available at the centers, the Foundation provides various educational programming focused on nutrition, physical activity, and other health and wellness topics.[3] The educational programming is available to nonmembers, though some of the presentations have an associated fee. The Foundation also offers a program referred to as "Next Steps" at the DWC and Chelsea Wellness Center (CWC). With a healthcare provider referral, participants can enroll in a program designed to combat a specific health challenge, such as cardiac fitness or weight management. Each eight-week program includes assessments at the beginning and end of the program, an individualized exercise plan, two 60-minute group workout sessions per week in a supervised setting, a summary report provided to the participant's referring healthcare provider, unlimited access to the fitness facility for the duration of the program, and an option to transition to full membership at a discounted fee. Though it costs the Foundation approximately $220 to facilitate an individualized program for each Next Steps participant, enrollment costs only $99.

An individual membership at the DWC costs $69 per month, but when various discounts are taken into account, the Foundation collected an average of $57 per billable member during the tax years at issue. The Foundation also provides two "scholarship" options for DWC membership. To be eligible for a scholarship, the recipient must demonstrate financial need by showing that his or her income is at or below 200% of the federal poverty level The first scholarship option allows the recipient to enroll in the Next Steps program free of charge and receive an additional month of free membership at the conclusion of the program. The second scholarship option allows the recipient to receive two months of free general membership. After the free membership period has elapsed under either option, the scholarship recipient can continue his or her membership at a reduced 50% rate. Scholarships are available for an unlimited duration, subject to review for continuing financial need and the requirement that the recipient uses the facility at least twice a week. According to Heydlauff, the eligibility standards are flexible and exceptions are generously available for extenuating circumstances. The Foundation began to prominently advertise the scholarship opportunities on the DWC's website

---

[3] By way of example, the DWC hosted the following programs in Winter 2014: National Diabetes Prevention, Pilates Demonstration, National Wear Red for Women Day, Strength Training: Myths and Facts, and Sports Nutrition.

in 2014, but did not have anyone apply for a scholarship in 2013 or 2014. The same scholarship opportunities are available at the Foundation's Chelsea location and an average of 33 scholarships are awarded at the CWC each year.

Dr. Anne Kittendorf, MD, another board member, testified regarding the importance of the Foundation's activities and fitness centers. She explained that community members who exercise at the DWC are engaging in primary prevention, which reduces their chances of suffering from ailments like high blood pressure, heart disease, stroke, cancer, and depression. Dr. Kittendorf cited studies finding that the benefits of exercise in terms of mortality rates are comparable to the benefits of drug intervention in treating certain chronic conditions. Additionally, other studies have demonstrated that those who exercise in community settings are more likely to adhere to their exercise program.

MCL 211.7o sets forth a number of property tax exemptions available to nonprofit or charitable organizations. The Foundation sought exemption under Subsection (1), which states:

> Real or personal property owned and occupied by a nonprofit charitable institution while occupied by that nonprofit charitable institution solely for the purposes for which that nonprofit charitable institution was incorporated is exempt from the collection of taxes under this act.[4]

Although the tribunal opined that the Foundation would otherwise qualify for exemption under this subsection, it rejected the Foundation's claim reasoning that it did not qualify as a charitable institution for purposes of exemption because its scholarship policies caused the Foundation to provide charity on a discriminatory basis, contrary to the third factor identified in *Wexford Medical Group v City of Cadillac*[5] for determining whether a petitioner is a charitable institution.

## II. STANDARD OF REVIEW

When considering matters originating in the Michigan Tax Tribunal, we employ the following standard of review:

> Where fraud is not claimed, this Court reviews the tribunal's decision for misapplication of the law or adoption of a wrong principle. We deem the tribunal's factual findings conclusive if they are supported by "competent, material, and substantial evidence on the whole record." But when statutory interpretation is involved, this Court reviews the tribunal's decision de novo.[6]

---

[4] MCL 211.7o(1).

[5] *Wexford Medical Group v City of Cadillac*, 474 Mich 192; 713 NW2d 734 (2006).

[6] *Liberty Hill Housing Corp v City of Livonia*, 480 Mich 44, 49; 746 NW2d 282 (2008) (citations omitted).

-4-

"Though this Court will generally defer to the Tax Tribunal's interpretation of a statute that it is delegated to administer, that deference will not extend to cases in which the tribunal makes a legal error."[7]

### III. ANALYSIS

To qualify for exemption under MCL 211.7o(1), the petitioner must establish three elements:

(1) The real estate must be owned and occupied by the exemption claimant;

(2) the exemption claimant must be a nonprofit charitable institution; and

(3) the exemption exists only when the buildings and other property thereon are occupied by the claimant solely for the purposes for which it was incorporated.[8]

With respect to the second element, the GPTA does not define the term "charitable institution." However, in *Wexford* the Court considered the historical development of exemptions granted to charitable organizations and identified six factors for determining whether a petitioner is a charitable institution:

(1) A "charitable institution" must be a nonprofit institution.

(2) A "charitable institution" is one that is organized chiefly, if not solely, for charity.

(3) A "charitable institution" does not offer its charity on a discriminatory basis by choosing who, among the group it purports to serve, deserves the services. Rather, a "charitable institution" serves any person who needs the particular type of charity being offered.

(4) A "charitable institution" brings people's minds or hearts under the influence of education or religion; relieves people's bodies from disease, suffering, or constraint; assists people to establish themselves for life; erects or maintains public buildings or works; or otherwise lessens the burdens of government.

(5) A "charitable institution" can charge for its services as long as the charges are not more than what is needed for its successful maintenance.

(6) A "charitable institution" need not meet any monetary threshold of charity to merit the charitable institution exemption; rather, if the overall nature of the

---

[7] *SBC Health Midwest, Inc v City of Kentwood*, 500 Mich 65, __; 894 NW2d 535 (2017); slip op at 5 (quotation marks and citation omitted).

[8] *Wexford*, 474 Mich at 203.

institution is charitable, it is a "charitable institution" regardless of how much money it devotes to charitable activities in a particular year.[9]

Importantly, "it is the overall nature of the institution, as opposed to its specific activities, that should be evaluated," to determine if the petitioner is a charitable institution.[10]

The main issue raised by the Foundation on appeal relates to the only *Wexford* factor that the tribunal determined the Foundation could not satisfy: factor 3. The tribunal observed that the DWC membership fees were generally market rates and considered the circumstances under which a potential member could obtain access to the DWC at a discounted price, placing particular emphasis on the Foundation's scholarship policies. It concluded that the Foundation could not satisfy factor 3 because "persons with financial difficulties still have hoops to jump through to be able to overcome financial barriers to use the facility."

As an initial matter, it must be noted that the tribunal erred by narrowly focusing on the Foundation's scholarship policies in analyzing this factor. The *Wexford* Court stated in no uncertain terms that "the institution's activities as a whole must be examined; it is improper to focus on one particular facet or activity."[11] The Foundation provides a variety of charitable services in the service area communities and at its two largest wellness centers. Thus, it was inappropriate for the tribunal to consider only the perceived barriers associated with the Foundation's scholarship policies, excluding from the scope of its analysis the manner in which the Foundation makes other charitable opportunities open to the public at large.

In any event, after the tribunal rendered its decision in this matter, our Supreme Court had cause to reevaluate the appropriate inquiry under the third *Wexford* factor. In *Baruch SLS, Inc v Tittabawassee Township*, the Court explained:

> The *Wexford* test is designed to differentiate charitable organizations from other kinds of institutions, but it is not designed to require an institution to offer its services entirely free or to select its recipients using only arbitrary criteria, such as first-come, first-serve, in order to qualify as a charitable institution. Yet the language in *Wexford* is, to some extent, susceptible to this interpretation, and indeed, this is how lower courts have understood *Wexford*'s third factor.[12]

The Court identified a number of problems with such an interpretation. For instance, considering the petitioner's charges as a discriminatory barrier is inconsistent with *Wexford*'s fifth factor, which permits a charitable organization to charge for its services, as long as the charges do not

---

[9] *Id*. at 215.

[10] *Id*. at 213.

[11] *Id*. at 212.

[12] *Baruch SLS, Inc v Tittabawassee Twp*, 500 Mich 345, __; __ NW2d __ (2017) (Docket No. 152047); slip op at 7.

exceed what is necessary for successful maintenance.[13] The Court reasoned that requiring a charitable institution to provide its services entirely for free was both unrealistic and unsustainable.[14] Likewise, because most charitable institutions cannot serve every person who might benefit from their services, they must select beneficiaries in some manner and should not be limited to strictly arbitrary metrics.[15] Thus, it concluded,

> [R]estrictions or conditions designed to limit or choose who is entitled to receive the charity . . . are the subject of factor three. Factor three is intended to exclude organizations that discriminate by imposing purposeless restrictions on the beneficiaries of the charity. We clarify that *Wexford* factor three accomplishes this goal by banning restrictions or conditions on charity that bear no reasonable relationship to an organization's legitimate charitable goals.[16]

With this understanding in mind, the Court further explained that if the petitioner's restrictions are reasonably related to a permissible charitable goal, the restrictions will not be construed as violating the third *Wexford* factor.[17] Moreover, "[t]he 'reasonable relationship' test should be broadly construed to prevent unnecessarily limiting the restrictions a charity may choose to place on its services."[18]

The evidence presented at trial overwhelmingly satisfies the third *Wexford* factor as interpreted in *Baruch*. Between April 1, 2013, and March 31, 2015, the Foundation provided over $1.7 million in grants for the benefit of the service area communities, subject only to the restriction that the intervention proposals were properly researched and documented and that the proposals would advance one of the Foundation's core elements, i.e., eating better, moving more, avoiding unhealthy substances, or connecting with others in a healthy way. These restrictions are reasonably related to the Foundation's charitable goals because they ensure that the Foundation's funds are spent only on programs that are likely to be successful and actually advance the Foundation's mission.

As it relates to the Foundation's wellness centers, the DWC's conference room is made available for use by community groups free of charge and complimentary guest passes are distributed with regularity to expose as many residents as possible to the DWC's amenities and services. The Foundation also sponsors health-oriented education programs at its fitness centers that are often available to nonmembers, again, free of cost. With respect to membership fees, the Foundation provides scholarship opportunities to low-income individuals. In addition to

---

[13] *Id*. at __; slip op at 9.

[14] *Id*. at __; slip op at 10.

[15] *Id*. at __; slip op at 9.

[16] *Id*. at __; slip op at 10.

[17] *Id*. at __; slip op 11, 13.

[18] *Id*. at __; slip op at 11.

providing verification of financial status, a scholarship recipient is required to use the facility at least twice a week, absent extenuating circumstances. These restrictions are reasonably related to the Foundations goals of creating a culture of wellness and fostering sustained health improvements for several reasons. Heydlauff explained that people with lower incomes often have poorer health and are therefore most in need of opportunities to improve their health through exercise. Additionally, Dr. Kittendorf described the positive health benefits of regular exercise and noted that the majority of these benefits can be realized through workouts of moderate intensity for a total of 150 minutes each week. By imposing income and usage requirements, the Foundation's scholarship policy targets an underserved population that is more likely to need healthy opportunities like those offered at the Foundation's wellness centers and establishes criteria that improve the odds that the scholarship recipient will experience measurable and sustained health improvements. Because the restrictions placed on the Foundation's charity all relate to its charitable goal, the Foundation satisfies *Wexford* factor 3.

On cross-appeal, Dexter challenges the tribunal's findings regarding the remaining *Wexford* factors, with the exception of factor 1. Treasury also challenges the tribunal's findings regarding *Wexford* factor 4. We find the arguments presented by intervening respondents unpersuasive.

*Wexford* factor 2 provides that "[a] 'charitable institution' is one that is organized chiefly, if not solely, for charity." When a petitioner is organized for several purposes, it does not satisfy this factor if only one of its direct or indirect purposes results in charity.[19] The purposes identified in the petitioner's organizational documents are relevant to this inquiry, but are not dispositive.[20] Although the term "charity" is not defined by statute, the *Wexford* Court reaffirmed earlier caselaw defining charity as:

> [A] gift, to be applied consistently with existing laws, for the benefit of an indefinite number of persons, either by bringing their minds or hearts under the influence of education or religion, by relieving their bodies from disease, suffering or constraint, by assisting them to establish themselves for life, or by erecting or maintaining public buildings or works or otherwise lessening the burdens of government.[21]

With this definition in mind, the tribunal correctly determined that the Foundation is organized chiefly, if not solely, for charity. The Foundation's November 2011 restated articles of incorporation describe the following purposes for organization:

---

[19] *Wexford*, 474 Mich at 204-205, citing *Attorney General v Common Council of City of Detroit*, 113 Mich 388; 71 NW 632 (1897).

[20] See, e.g., *Wexford*, 474 Mich at 215-216; *Mich Baptist Homes & Dev Co v City of Ann Arbor*, 396 Mich 660, 670-671; 242 NW2d 749 (1976).

[21] *Wexford*, 474 Mich at 214, quoting *Retirement Homes of the Detroit Annual Conference of the United Methodist Church, Inc v Sylvan Twp*, 416 Mich 340, 348-349; 330 NW2d 682 (1982).

a. To operate exclusively for the purposes set forth in Section 501(c)(3) of the Internal Revenue Code . . .;

b. To receive and administer funds, to acquire, to own, to invest, to dispose of, and to deal with real and personal property and interests therein, and to apply gifts, grants, contributions, bequests and devises, and the income and proceeds, generally, in furtherance of making significant, measurable, and sustainable improvements in the health and wellness of residents of the Service Area and in furtherance of providing financial support for nonprofit organizations[; and]

c. To support significant, measurable, and sustainable improvements in the health and wellness of residents in the Service Area and in furtherance of the development of strategies to ensure access to health services for those in need.

Its bylaws identify the same purposes. The Foundation fulfills its stated purposes by using its considerable resources to fund coalition initiatives that further at least one of the Foundation's four vision elements, which, in turn, advances the Foundation's overall organizational purpose of making significant, measurable, and sustainable improvements in the health and wellness of residents within the service area. The Foundation also operates wellness centers where members may exercise and the community at large can participate in health-based educational programs in a group setting. Although the Foundation charges monthly fees to its wellness center members, many of the Foundation-funded initiatives are provided to the community free of cost. Other opportunities, like the Next Steps program, are available for a fee that is less than the cost incurred by the Foundation. And for the reasons explained in our analysis of factor 4, the Foundation's gifts to the community also meet the definition of "charity" because they lessen the burdens of government. Accordingly, because the Foundation's stated organizational purposes are charitable, and its activities are consistent with those self-identified purposes, the tribunal correctly concluded that the Foundation satisfied *Wexford* factor 2.

Dexter maintains that the Foundation is not organized for charity because it also engages in commercial type activity by owning various interests in real estate and a retirement community. The tribunal rejected these arguments, noting that the interests with which Dexter took issue were acquired as a condition to the merger between Chelsea Community Hospital and Saint Joseph Mercy Health System to avoid the problems that might arise if a Catholic institution acquired the hospital's previous interest in a Methodist organization and real estate that was ground leased to clinics providing reproductive health services, contrary to the Catholic church's ethical and religious directives. The tribunal's response to Dexter's argument was well reasoned and supported by competent, material, and substantial evidence, including the 2008 merger agreement, Heydlauff's testimony concerning the creation of the Foundation, and the testimony of Patrick J. Conlin, former chairman of the hospital's Board of Trustees at the time of the merger. Dexter also contends that the Foundation is not organized for charity because the majority of its expenditures go to operating its wellness centers. This argument lacks merit

because it focuses on the Foundation's operational activities, rather than its organizational purposes.[22]

*Wexford* factor 4 provides that "[a] 'charitable institution' brings people's minds or hearts under the influence of education or religion; relieves people's bodies from disease, suffering, or constraint; assists people to establish themselves for life; erects or maintains public buildings or works; or otherwise lessens the burdens of government."[23]  The tribunal rejected the Foundation's contention that its activities relieved people's bodies from disease, suffering, or constraint, but concluded that the Foundation satisfied this factor nonetheless because it lessened the government's healthcare burdens.  It explained,

> Clearly, prevention of a healthcare apocalypse as the boomer generation ages, and younger generations suffer from obesity is a problem that the state, as well as the Federal government will be burdened with in the form of Medicare and Medicaid expenses, as well as lost productivity.  Centers such as the subject that address the non-covered ailment of deconditioning help reduce the burden of government.

Giving proper deference to the tribunal's interpretation of this factor,[24] its determination that the Foundation's activities lessen the burdens of government was adequately supported by the Foundation's evidence.  In June 2012, the Michigan Department of Community Health released a Health and Wellness 4 x 4 Plan, "which contains Michigan's priorities for obesity prevention over the next five years."  The Department explained that sedentary lifestyles and unhealthy eating habits contribute to the increasing prevalence of obesity in our population, which is at the root of many chronic illnesses including diabetes, heart disease, arthritis, stroke, and dementia.  To facilitate improved health within Michigan's population, the Department's 4 x 4 Plan encourages four key practices: maintaining a healthy diet, engaging in regular physical exercise, getting an annual physical examination, and avoiding tobacco use and exposure.  As noted by Heydlauff, these strategies closely mirror the Foundation's central focus on eating better, moving more, avoiding unhealthy substances, and connecting with others in healthy ways.  Importantly, in addition to individual health concerns, the Department recognized that 75% of total healthcare expenditures are associated with treating chronic diseases and that the state could save over $13 billion annually in healthcare costs if its citizens improved their health by reducing their average body mass index rates.  Thus, the evidence suggests that by undertaking measures designed to improve the health of the population within its service area, the Foundation's activities will lessen the government's financial burden associated with healthcare expenses.

---

[22] See *McLaren Regional Med Ct v City of Owosso (On Remand)*, 275 Mich App 401, 413; 738 NW2d 777 (2007) (rejecting the respondent's argument regarding the manner in which charity was provided because it related to the petitioner's manner of operating, rather than the nature of its organization).

[23] *Wexford*, 474 Mich at 215.

[24] *SBC Health Midwest, Inc*, 500 Mich at __; slip op at 5.

Dexter and Treasury challenge the Tribunal's finding relative to this factor, arguing that the Foundation's operation of the DWC does not lessen a governmental burden because the government is not obligated to provide recreational or fitness facilities. Dexter and Treasury rely on a series of unpublished cases reasoning that a petitioner cannot satisfy this factor when it fails to show that the government is obligated to provide the specific type of service offered at the subject property. However, this Court is not bound by the cases cited by intervening respondents, which lack precedential value.[25] Moreover, these unpublished cases are unpersuasive in the present context because they are distinguishable from the instant matter in that the respective petitioners failed to link their charitable activities to any burden that the government is legally obligated to undertake.[26] By contrast, the Foundation identified several statutorily mandated governmental obligations that its activities help to lessen.

For instance, the state constitution provides: "The public health and general welfare of the people of the state are hereby declared to be matters of primary public concern. The legislature shall pass suitable laws for the protection and promotion of public health."[27] Pursuant to this mandate, the Legislature enacted MCL 333.2221, which directs the Department of Community Health[28] to

> continually and diligently endeavor to prevent disease, prolong life, and promote the public health through organized programs, including prevention and control of environmental health hazards; prevention and control of diseases; prevention and control of health problems of particularly vulnerable population groups; development of health care facilities and agencies and health services delivery

---

[25] MCR 7.215(C)(1); *Ally Fin, Inc v State Treasurer*, 317 Mich App 316, 335; 894 NW2d 673 (2016).

[26] See *Boyne Area Gymnastics, Inc v City of Boyne City*, unpublished opinion per curiam of the Court of Appeals, issued May 15, 2012 (Docket No. 303590), p 6 ("[P]etitioner has failed to cite any evidence that it is the government's burden to provide physical fitness and gymnastics classes to children and young adults."); *Involved Citizens Enterprises, Inc v Twp of East Bay*, unpublished opinion per curiam of the Court of Appeals, issued October 29, 2009 (Docket No. 284706) , p 5 ("[P]etitioner did not cite evidence 'upon which to base a claim that it is a duty, a responsibility, or a requirement of a unit of government to provide skating facilities or any specific type of recreational facility.' "); *N Ottawa Rod & Gun Club, Inc v Grand Haven Charter Twp*, unpublished opinion per curiam of the Court of Appeals, issued August 21, 2007 (Docket No. 268308), p 3 ("Because petitioner failed to provide that a government burden existed in the first instance with respect to this specific type of training, it ipso facto failed to prove that it had lessened a burden of government.").

[27] Const 1963, art 4, § 51.

[28] Beginning at Section 2201, the Public Health Code, MCL 333.1101 *et seq.*, sets forth provisions relating to the Department of Public Health. However, the Department of Public was consolidated with several other departments to form the Department of Community Health. Executive Order No. 1996-1.

systems; and regulation of health care facilities and agencies and health services delivery systems to the extent provided by law.[29]

The Department of Community Health is also required to encourage and assist in developing activities related to "health education,"[30] which is defined, in pertinent part, as "that dimension of health care that directs attention of individuals to their health behavior with the goal of enabling the individuals to make reasoned decisions about their own health practices and those within the various communities in which the individuals live, work, and play."[31] While intervening respondents are correct that the government is not obligated by law to provide a fitness facility, it is evident that the government *is* required to take steps to promote and improve public health.

*Wexford* factor 5 provides that a charitable institution "can charge for its services as long as the charges are not more than what is needed for its successful maintenance."[32] The tribunal determined that the Foundation satisfied this factor because the DWC operated at a loss during the tax years at issue and any profit the Foundation might realize in the future would be devoted back to mission spending. This finding is well supported by competent, material, and substantial evidence. The Foundation's financial reports indicate that the DWC suffered a loss of $916,324 in the 2014 fiscal year and $758,203 in the 2015 fiscal year.[33] These operating losses suggest that the membership fees charged at the DWC are not more than is necessary for its successful maintenance. And, as noted by the tribunal, several of the Foundation's board members confirmed that any profits would be reinvested into the Foundation's charitable mission.

However, the tribunal's analysis of this inquiry was too narrow. "The *Wexford* test is designed to differentiate charitable organizations from other kinds of institutions,"[34] and the tribunal's exclusive focus on the DWC operations failed to take into account the Foundation's activities as a whole, as required by *Wexford*.[35] Nonetheless, the tribunal's error in this regard was harmless because other evidence demonstrated that on the occasions the Foundation charged a fee for its services, those fees were not more than necessary. The combined operations of the Foundation's four fitness centers, including educational programming, also resulted in losses during the relevant tax years. In the absence of a scholarship, people who enroll in the Next Steps program are charged an enrollment fee, but testimony revealed that the fee does not cover the costs incurred by the Foundation to operate the program, the balance of which it subsidizes. The remainder of the Foundation's charitable activities are generally provided free of charge.

---

[29] MCL 333.2221(1).

[30] MCL 333.2237(1).

[31] MCL 333.2237(2).

[32] *Wexford*, 474 Mich at 215.

[33] The 2015 operational loss figure excludes amounts identified as intercompany transfers.

[34] *Baruch*, 500 Mich at __; slip op at 7.

[35] *Wexford*, 474 Mich at 212.

As it does on appeal, Dexter argued that testimony indicating that the Foundation aspired to break even in its operation of the DWC demonstrates that it does not offer a charitable "gift" to members of the DWC. The tribunal correctly observed that this argument was explicitly rejected in *Wexford*:

> Respondent argues that petitioner's goal of profitability negates its claim that it is a charitable institution. We find that argument hollow. Petitioner's bylaws do not allow any individual to profit monetarily from the petitioner's clinic; thus, "profitability" has a different meaning for this institution than it would for an entity whose goal it was to reward its agents or shareholders with profits. And the idea that an institution cannot be a charitable one unless its losses exceed its income places an extraordinary—and ultimately detrimental—burden on charities to continually lose money to benefit from tax exemption. A charitable institution can have a net gain—it is what the institution does with the gain that is relevant. When the gain is invested back into the institution to maintain its viability, this serves as evidence, not negation, of the institution's "charitable" nature.[36]

Like the petitioner in *Wexford*, the Foundation's bylaws prohibit its directors, officers, or other private individuals from profiting from the Foundation's earnings. Moreover, because potential profits would be reinvested for charitable purposes, the Foundation's financial goals in connection with the DWC lend support to the Foundation's contention that it is a charitable organization for purposes of property tax exemption.[37]

The final *Wexford* factor states that a charitable institution "need not meet any monetary threshold of charity to merit the charitable institution exemption; rather, if the overall nature of the institution is charitable, it is a 'charitable institution' regardless of how much money it devotes to charitable activities in a particular year."[38] The tribunal reasoned that the Foundation satisfied this factor, despite the limited scholarships it provided for DWC membership, because its other activities were overwhelmingly charitable. On appeal, Dexter contends that the tribunal erred because the Foundation purportedly offered little to no charity at the DWC during the relevant time frame. We disagree. The tribunal's finding in this regard was clearly supported by competent, material, and substantial evidence. The Foundation was established and funded for the express purpose of promoting health, wellness and fitness education, healthcare initiatives, and community-based activities in the service area, and it has gone to great lengths to serve this purpose by supporting and funding feasible intervention plans and operating the wellness centers for the benefit of the service area. That no residents took advantage of the scholarship program at the DWC in the relevant tax years is of little consequence considering the balance of the Foundation's charitable work. And while *Wexford* makes clear that there is no monetary threshold for determining whether an exemption claimant is a charitable organization, it is worth

---

[36] *Id*. at 217-218 (citation omitted).

[37] *Id*. at 218.

[38] *Wexford*, 474 Mich at 215.

noting that that the Foundation issued grants in furtherance of its charitable purposes in excess of $1.7 million dollars during the two tax years at issue. Thus, even if the Court accepted Dexter's tenuous argument concerning the level of charity offered *at the DWC*, Dexter's position still misses the mark because it utterly ignores the overall nature of the Foundation's activities.

In sum, it is undisputed that the Foundation is organized as a nonprofit institution, which satisfies *Wexford* factor 1, and we find no error requiring reversal with respect to the tribunal's conclusion that the Foundation satisfies *Wexford* factors 2, 4, 5, and 6. Furthermore, in light of the clarified standard applicable to *Wexford* factor 3 announced in *Baruch*, we conclude that the Foundation also satisfies that factor. Accordingly, the Foundation qualifies as a charitable institution for purposes of exemption under Section 7o of the GPTA.

Next, Dexter and Treasury challenge the tribunal's determination that the DWC property is "owned and occupied" by the Foundation, arguing that the property is actually occupied by Power Wellness Management (PWM), the unrelated for-profit company that the Foundation employs to manage the day-to-day operations of its fitness centers. We disagree.

The leading case concerning the first element is *Liberty Hill Housing Corp v City of Livonia*.[39] The petitioner in *Liberty Hill* was incorporated to "creat[e] integrated housing alternatives for low income individuals and families, and persons with disabilities, to interact with the general public, and to promote the establishment of safe, affordable and accessible as necessary housing for low-income individuals and families and persons with disabilities."[40] In furtherance of this purpose, the petitioner leased or rented a number of single-family homes to qualifying tenants.[41] In affirming the denial of the petitioner's request for property tax exemption under MCL 211.7o(1), the *Liberty Hill* Court held that the occupancy aspect of the first element requires that "the charitable institution must at a minimum have a regular physical presence on the property."[42] Thus, the petitioner did not qualify for exemption because its tenants "occupied" the subject properties.[43]

In this case, the tribunal determined before trial that the Foundation could not occupy the property by virtue of the physical presence of its agent, PWM. But after considering the proofs presented at trial, it nonetheless determined that the Foundation occupied the property based upon the following facts:

> Matthew Pegouskie, an employee of Petitioner testified that he has an office at the subject property, at which he spends on average 8 hours per week. Amy Heydlauff testified that she has her own mailbox at the facility, as well as keys to

---

[39] *Liberty Hill Housing Corp*, 480 Mich 44.

[40] *Id*. at 46.

[41] *Id*. at 46-47.

[42] *Id*. at 58.

[43] *Id*.

the facility and unrestricted access. Angela Sargent, of PWM and director of the subject property testified that Ms. Heydlauff maintains an office at the facility and has regularly observed Ms. Heydlauff's presence throughout the facility. Sargent also testified that Petitioner's healthcare advisory committee meets at the subject, and [Foundation] Board Members have been at the facility on Board business 633 times since it opened in 2013. Finally, Petitioner maintains a regular physical presence in that all of the furniture and equipment present at the facility is owned by [the Foundation], rather than PWM.

The tribunal's factual findings require some correction. Pegouskie and Heydlauff share a cubicle in the administrative area of the DWC. Both have keys to the facility and enjoy unrestricted access. Although Pegouskie first testified that he spends approximately 8 hours a week at the DWC, he later clarified that he spends 8 hours working in the office and approximately 3 to 4 additional hours each week in other areas of the DWC. He also attends the Dexter coalition meetings held in the facility's conference room. Heydlauff testified that she visits the DWC approximately two times a week. Although Heydlauff noted that the time she spent in the facility on these occasions can vary dramatically, the tribunal correctly noted that Sargent recalled seeing Heydlauff at the DWC with regularity. However, Sargent did not place any significance on the presence of the advisory committee at the DWC. Rather, she explained that the committee only met quarterly and, although they had met at the DWC before, they primarily convened at the Chelsea location. Furthermore, Sargent did not testify that the Foundation's board members conducted business at the DWC on 633 occasions; she agreed that the board members receive complimentary access to the DWC in consideration of their services and reported that the members came to the center 633 times since it opened. Even accepting that the board members might report problems they observe to Heydlauff, the tribunal's characterization of the board members personal use of the facility as Foundation business is dubious at best.

Notwithstanding the above, this Court will defer to the tribunal's interpretation of tax statutes in the absence of legal error,[44] and these minor factual clarifications do not render the tribunal's conclusion legally erroneous. Unlike the petitioner in *Liberty Hill*, the Foundation did not forfeit its occupancy rights to PWM and, indeed, Pegouskie and Heydlauff both exercised that right by spending time at the DWC with regularity.[45] As already noted, Pegouskie worked at the DWC an average of 11 to 12 hours per week. Although Heydlauff could not estimate the number of hours she spent at the DWC on any given day, her presence was frequent enough that the DWC's director considered it common and agreed that Heydlauff had a hands-on oversight

---

[44] *SBC Health Midwest*, 500 Mich at __;slip op at 5 (quotation marks and citation omitted).

[45] Although Treasury makes much of the fact that the original management agreement between the Foundation and PWM limited the Foundation's right of entry, Heydlauff testified that the agreement was amended to more accurately reflect the true relationship between the Foundation and PWM. Heydlauff's explanation was corroborated by the testimony of two PWM facility directors indicating that they did not have authority to restrict the Foundation's access to the wellness centers.

style. Additionally, Pegouskie explained that it was a rare occurrence for their visits to overlap. Although PWM's presence at the DWC undoubtedly exceeded that of the Foundation's employees, the tribunal correctly noted that there is no exclusivity requirement in MCL 211.7o(1). While Heydlauff's and Pegouskie's physical presence was by no means constant, the occupancy component of the first element only requires a *regular* physical presence.[46]

Lastly, Dexter also cross-appeals the tribunal's determination that the Foundation satisfied the third element of MCL 211.7o(1), requiring that the property be occupied solely for the purposes for which it was incorporated. According to Dexter, the Foundation does not satisfy this element because the DWC members are charged market rates for access to the facility, which means that the Foundation is not providing charity at the DWC. Dexter maintains that the free or subsidized programs available at the DWC were limited during the relevant tax years and the Foundation's other charitable activities occur elsewhere. We disagree.

In *Gull Lake Bible Conference Ass'n v Ross Twp*,[47] the Court was called upon to interpret a predecessor to the current charitable institution exemption statute. Although the requirements of the former statute varied from the existing version of MCL 211.7o(1), the plaintiff was still required to demonstrate that the property was occupied solely for the purposes for which it was incorporated.[48] According to its organizational documents, the plaintiff's stated purpose for incorporation was "[t]o promote and conduct gatherings at all seasons of the year for the study of the Bible and for inspirational and evangelistic addresses."[49] The sizeable property at issue contained a number of structures and a camp area that were used for purposes of housing the plaintiffs' employees and patrons.[50] The property also contained various recreational amenities, including "a fellowship center building, picnic area, boat docks, bath house, bathing beach, playground, and horseshoe and badminton courts."[51] After considering the plaintiff's stated purpose of promoting and conducting specified gatherings, the Court concluded that the plaintiffs' use of the living accommodations and recreational facilities was necessary to obtain satisfactory attendance in furtherance of its stated purpose for incorporation.[52] Thus, it was entitled to exemption.[53]

---

[46] *Liberty Hill House Corp*, 480 Mich at 58.

[47] *Gull Lake Bible Conference Ass'n v Ross Twp*, 351 Mich 269; 88 NW2d 264 (1958).

[48] *Id*. at 273.

[49] *Id*. at 271.

[50] *Id*. at 272.

[51] *Id*.

[52] *Id*. at 275.

[53] *Id*.

A similar result was reached in *Oakwood Hospital Corp v Mich State Tax Commission*.[54] The property at issue in *Oakwood Hospital Corp* was a portion of the hospital plaintiff's real estate on which several residential houses were situated.[55] The houses were built for the purpose of providing nearby living quarters for the plaintiff's resident physicians and interns and leased to its employees for that purpose.[56] The defendant argued that the houses were not exempt because they were used for residential purposes, rather than the purpose for which the plaintiff was incorporated, namely, operating a hospital.[57] The Court disagreed, reasoning that the close proximity of the houses was important to the operation of the hospital because it enabled doctors and interns to be available upon short notice.[58] Accordingly, the Court concluded that the houses were "owned by plaintiff and occupied in furtherance of and for the purposes for which plaintiff was incorporated . . . ."[59]

From these cases, it is evident that the final element of MCL 211.7o(1) can be satisfied when the use made of the property furthers the claimant's purpose for incorporation. As such, Dexter's argument concerning the Foundation's purported failure to provide charity at the DWC stems from a false understanding of the last statutory requirement. Although the petitioner must be incorporated chiefly, if not solely, for charity to constitute a charitable organization under *Wexford*,[60] it does not necessarily follow, as Dexter contends, that charity must be provided at the subject property. By the same token, an exemption would not be warranted for property owned and occupied by a charitable organization merely because charity was provided on that property if the charity was inconsistent with the organization's purpose for incorporation. For instance, if the Foundation converted the DWC to a seminary and offered free religious tutelage to service area residents, it would not qualify for exemption. Although such tutelage would amount to charity because it was offered as a gift to an indefinite number of people, bringing their minds and hearts under the influence of religion, it would not advance the Foundation's purposes for incorporation.

Here, the Foundation was incorporated to engage in activities that "support significant, measurable, and sustainable improvements in the health and wellness of residents in the Service Area . . . ." In response to an inquiry concerning the importance of the fitness centers to its overall strategy, Heydlauff explained,

> [O]f all the things we do, of all the things we fund in our communities, our biggest impact, the biggest, largest number of people that we're able to impact are

---

[54] *Oakwood Hosp Corp v Mich State Tax Comm*, 374 Mich 524; 132 NW2d 634 (1965).

[55] *Id*. at 527.

[56] *Id*.

[57] *Id*. at 529.

[58] *Id*. at 530.

[59] *Id*.

[60] *Wexford*, 474 Mich at 215.

through our Wellness Centers, and that's just for -- just for the members. . . . [W]hen you start adding all of the community programs and the other offerings that we provide for the community and the other opportunities that we provide there, then it's even a bigger impact.

The Foundation's use of the DWC as a fitness facility furthers its purposes for incorporation by enabling healthy exercising habits and providing opportunities to participate in health-related educational programming. As such, the Foundation satisfies the third element for exemption under MCL 211.7o(1), and the tribunal did not err in concluding so.

## IV. CONCLUSION

Because the Foundation has satisfactorily proven that it is a charitable organization and owns and occupies the DWC, which it uses solely for the purposes for which it was incorporated, the Foundation is entitled to exemption from property taxes under MCL 211.7o(1). Accordingly, we need not address the Foundation's remaining claims of error. The tribunal's April 6, 2016 order is reversed to the extent that it found that the Foundation's DWC property was not exempt and we remand this matter to the tribunal for entry of an order consistent with this opinion. We do not retain jurisdiction.

/s/ Michael J. Talbot
/s/ Peter D. O'Connell
/s/ Colleen A. O'Brien