*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

DEARBORN HEIGHTS MONTESSORI
CENTER, INC., d/b/a LIVONIA MONTESSORI
SCHOOL,

      Petitioner-Appellant,

v

CITY OF LIVONIA,

      Respondent-Appellee.

UNPUBLISHED
February 14, 2019

No. 341920
Tax Tribunal
LC No. 15-000568

Before: SWARTZLE, P.J., and MARKEY and RONAYNE KRAUSE, JJ.

PER CURIAM.

Petitioner, Dearborn Heights Montessori Center, Inc. (the school), appeals by right the decision of the Michigan Tax Tribunal (MTT), which found in favor of defendant, City of Livonia (the city), and rejected the school's assertion that it qualifies as a nonprofit charitable institution for purposes of an exemption from ad valorem property taxes under MCL 211.7o relative to its Livonia campus. We conclude that the MTT did not err in ruling that the school is not a nonprofit charitable institution under MCL 211.7o. Accordingly, we affirm the ruling of the MTT.

## I. MCL 211.7o – TAX EXEMPTION FOR NONPROFIT CHARITABLE INSTITUTIONS

To provide the proper context and a better understanding of our discussion of the factual and procedural history of the case, we first set forth the relevant law applicable to this case and the underlying legal framework.

Under the General Property Tax Act (GPTA), MCL 211.1 *et seq.*, "all property, real and personal, within the jurisdiction of this state, not expressly exempted, shall be subject to taxation." MCL 211.1. MCL 211.7o(1) provides that "[r]eal or personal property owned and occupied by a nonprofit charitable institution while occupied by that nonprofit charitable

institution solely for the purposes for which that nonprofit charitable institution was incorporated is exempt from the collection of taxes under this act." The GPTA does not define "charitable institution."[1] Because the Legislature chose not to define the term "charitable institution" as used in MCL 211.7o, the specific meaning of "charitable institution" has been the subject of much caselaw. *Wexford Med Group v City of Cadillac*, 474 Mich 192, 202; 713 NW2d 734 (2006).

To establish an exemption under MCL 211.7o, the claimant must show that: (1) the real estate is owned and occupied by the claimant; (2) the claimant is a nonprofit charitable institution, and (3) the property is occupied by the claimant solely for the purpose for which it was incorporated. *Wexford*, 474 Mich at 203. In *Wexford*, our Supreme Court examined numerous cases addressing the meaning of "charitable institution" and then observed:

> Several common threads can be found in this line of cases. First, it is clear that the institution's activities as a whole must be examined; it is improper to focus on one particular facet or activity. In that sense, the inquiry pertains more to whether an institution could be considered a "charitable" one, rather than whether the institution offers charity or performs charitable work. So it is the overall nature of the institution, as opposed to its specific activities, that should be evaluated.
>
> A second indispensable principle is that the organization must offer its charitable deeds to benefit people who need the type of charity being offered. In a general sense, there can be no restrictions on those who are afforded the benefit of the institution's charitable deeds. This does not mean, however, that a charity has to serve every single person regardless of the type of charity offered or the type of charity sought. Rather, a charitable institution can exist to serve a particular group or type of person, but the charitable institution cannot discriminate within that group. The charitable institution's reach and preclusions must be gauged in terms of the type and scope of charity it offers.
>
> From these precepts, it naturally follows that each case is unique and deserving of separate examination. Consequently, there can be no threshold imposed under the statute. The Legislature provided no measuring device with which to gauge an institution's charitable composition, and we cannot presuppose the existence of one. To say that an institution must devote a certain percentage of its time or resources to charity before it merits a tax exemption places an artificial parameter on the charitable institution statute that is unsanctioned by the Legislature. [*Id.* at 212-213.]

Ultimately, the *Wexford* Court distilled the analysis down to six factors that "come into play when determining whether an institution is a 'charitable institution' under MCL 211.7o." *Id.* at 215. They are as follows:

---

[1] There is no dispute that the school is a nonprofit institution.

-2-

(1) A "charitable institution" must be a nonprofit institution.

(2) A "charitable institution" is one that is organized chiefly, if not solely, for charity.

(3) A "charitable institution" does not offer its charity on a discriminatory basis by choosing who, among the group it purports to serve, deserves the services. Rather, a "charitable institution" serves any person who needs the particular type of charity being offered.

(4) A "charitable institution" brings people's minds or hearts under the influence of education or religion; relieves people's bodies from disease, suffering, or constraint; assists people to establish themselves for life; erects or maintains public buildings or works; or otherwise lessens the burdens of government.

(5) A "charitable institution" can charge for its services as long as the charges are not more than what is needed for its successful maintenance.

(6) A "charitable institution" need not meet any monetary threshold of charity to merit the charitable institution exemption; rather, if the overall nature of the institution is charitable, it is a "charitable institution" regardless of how much money it devotes to charitable activities in a particular year. [*Id.*]

Subsequently, in *Baruch SLS, Inc v Tittabawassee Twp*, 500 Mich 345, 348; 901 NW2d 843 (2017), our Supreme Court clarified *Wexford* factor three, observing:

In this case, we consider whether petitioner . . . qualifies as a charitable institution for purposes of the exemptions from real and personal property taxes set forth in MCL 211.7o and MCL 211.9. In *Wexford* . . ., we articulated a six-factor test for determining whether an institution qualifies as a charitable institution. We now clarify *Wexford*'s third factor, which requires that an institution not offer its charity on a "discriminatory basis."

As set forth below, the third factor . . . excludes only restrictions or conditions on charity that bear no reasonable relationship to a permissible charitable goal. [Citation omitted.]

## II.  PROCEEDINGS IN THE MTT

Having laid the legal groundwork for the case, we now move on to review the proceedings in the MTT.  In April 2015, the school filed a petition of appeal with the MTT, which ultimately encompassed tax years 2015 and 2016.  The school alleged that it is authorized to operate as a school by the Michigan Department of Education, that it is a § 501(c)(3) tax exempt organization under the Internal Revenue Code (IRC), that it "is open to and serves the

entire community," and that it "has specific educational curriculum for all students including preschool students."[2] The school asserted that it "utilizes educational instruction patterned after the Maria Montessori methodology which places a strong emphasis on independence, freedom within limits, and respect for a child's natural psychological, physical, and social development." The petition indicated that a hearing had been conducted before the city's Board of Review (the board), that the decision of the board upheld the assessed property taxes, and that the board "failed to address the basis set forth by the Petitioner for the review." The school claimed that it was a charitable organization and had "been wrongfully assessed property taxes for the subject property."

The school alleged that it had a charitable purpose and met the three *Wexford* requirements of MCL 211.7o, making it exempt from property taxation. The school also asserted that the city had applied the wrong standard of review and that the city waived its right to argue a non-charitable purpose because it failed to address the school's charitable-purpose argument that was presented at the board hearing.

In January 2016, the MTT entered a default against the school for failure to serve the petition on all parties-in-interest. In February 2016, the MTT set aside the default. At the city's request, the MTT issued an order in March 2016 holding the case in abeyance to await a decision by this Court in a different case. In October 2016, the MTT entered an order removing the case from abeyance. In January 2017, the city moved for summary disposition. The city noted that it had granted the school a partial educational exemption of 25% for 2014, 2015, and 2016, that, unhappy with that exemption, the school pursued a charitable institution exemption, and that the board refused to change the assessment. The city argued that discovery had closed and that the information the school provided did not "meet the standard required for entitlement to the charitable exemption." By order and opinion issued in April 2017, the MTT denied the city's motion for summary disposition, ruling that genuine issues of material fact existed with respect to whether the school qualified as a charitable institution for purposes of MCL 211.7o.

An evidentiary hearing was held on September 11, 2017, with the parties submitting numerous documents that were made part of the MTT's record. The only witness was the school's, Kay Neff.

*Documents*

The 2015 board decision revealed that the assessed and taxable value of the school's property (Livonia campus) was $181,860, to which the board made no adjustments following the school's challenge. The decision also expressly rejected the school's request for a charitable institution exemption, stating:

---

[2] A single entity, Dearborn Heights Montessori Center, Inc., which we have been referring to as "the school," owns and operates a Montessori school in Dearborn Heights, along with two satellite campuses in Plymouth-Canton and Livonia. It is the property at the Livonia campus that is the subject of this tax dispute.

Does not clearly fall within the charitable or educational exemption provided for under state law. Currently, 20 of 32 students are preschool which does not fall under the State Educational Plan. Any scholarships only relieve half of the fee.

The articles of incorporation for the school set forth the following purpose for its incorporation:

To provide educational programs for children using the Montessori methods of instruction, including the operation of a pre-school, kindergarten, elementary school, where such programs have a regularly scheduled curriculum, a regular faculty, and a regularly enrolled student body in attendance at the place where such activities are regularly carried on. . . . .

The articles of incorporation did not explicitly mention or indicate that the school was formed for a charitable purpose.

Accounting documents showed that in 2014 and 2015 the school, including the Livonia campus, had large operating losses.[3] The school had a tuition assistance program, which originated in late 2008 and was described as follows in school literature:

The tuition assistance program at Dearborn Heights Montessori Center, Livonia Montessori School, and Plymouth-Canton Montessori School is intended to help families who are having difficulty meeting their tuition obligation. The number of awards given and their amounts will be limited by the resources we have available; all families who apply may not qualify.

Our goal with this program is to allow the children of families who are committed to Montessori education and who have supported the school through their volunteer efforts and positive spirit to be able to continue despite financial reverses. We will also consider new families with similar needs.

The tuition assistance program was managed by Financial Aid for School Tuition (FAST) and overseen by Independent School Management. The FAST service was described in the school's informational pamphlets as "a need-based financial aid analysis service which determines what a family should reasonably contribute toward tuition." Subsequently, there was a change in the tuition assistance program, and in school literature specifically regarding the Livonia campus, it was indicated:

Livonia Montessori School has a total enrollment of 35 students. Any child for whom a tuition assistance application is submitted is given an award. Although the tuition assistance program was initially established to help enrolled

_____

[3] In 2014, the Livonia campus had an operating loss of $249,182.

families . . . who had been severely affected by the 2008 financial debacle, by its second year new students were being given awards.

In regard to the tuition assistance program, the school produced documents indicating that with respect to the Livonia campus one student received a $2,000 award in the 2013-2014 school year, one student received a $3,000 award in the 2014-2015 school year, one student received a $3,865 award in the 2015-2016 school year, and that four students received awards totaling $8,385 in the 2016-2017 school year.[4]  As reflected in Neff's testimony discussed below, an "award" merely means that a family received a discounted tuition rate in the amount of the award; the awards are not funded by any source.

With respect to tuition rates at the Livonia campus, the annual cost of half-day preschool/kindergarten ranged from $6,200 to $6,400; the annual cost of preschool/kindergarten with full daycare ranged from $11,155 to $11,520, and the annual cost of extended-day kindergarten ranged from $10,650 to $11,000.[5]

*Kay Neff's Testimony*

Neff is the founder and head of the school. (Tr, 6)  Neff testified at length about the Montessori approach to education. (Tr, 8-23)  When asked whether the school was established for charitable purposes, Neff responded, "I think so, yes.  In the sense particularly that education is a charitable endeavor.  In general, we try to work with the children to make them the best people they know how to be."  (Tr, 24)  Neff explained that she does the budgeting for the school and sets the tuition rates.  (Tr, 26)  She testified that the school has a five-member board of directors.  (Tr, 26)  Neff indicated that the revenue to operate the school comes mostly from tuition and fees and that only "occasionally" does the school engage in fundraising and the elicitation of contributions.  (Tr, 27)  With regard to how tuition rates are established, Neff explained:

> Well, I hate to say to a certain degree it's a guessing game because what you're trying to do is project forward. We try to think about what the enrollment will be which is our source of income because that's—we're tuition based. I try to look at things that I know will cost certain things. . . . But I don't know what's going to happen the next year with health insurance rates. I can't predict the

---

[4] The Plymouth-Canton campus, which had 57 students, had comparable figures regarding the number of awards and the amount of the awards.  In regard to the main campus, Dearborn Heights Montessori Center, which had 250 students, 11 students received $28,920 in total awards for the 2013-2014 school year, 11 students received $33,700 in total awards for the 2014-2015 school year, 13 students received $40,450 in total awards for the 2015-2016 school year, and 12 students received $33,000 in total awards for the 2016-2017 school year.

[5] These rates were for the 2015-2016 school year; the range in prices for any given category reflected payment options, e.g., the low end of the range applied when payment was made in one lump sum.  These tuition rates reflected an increase in tuition from the 2014-2015 school year.

winter. . . . So I try to figure out what we will need going forward to cover as best we can. [Tr, 28]

Neff testified that the school did not make a profit, that it had an operating loss in each of the last four years, and that she could not charge tuition in an amount that would cover the actual costs to run the school. (Tr, 29) The Livonia campus last operated at a surplus probably around 2001. (Tr, 41) The school did have some funds in two reserve accounts, a brokerage account and a bank CD, to cover shortages, unexpected costs, and emergencies. (Tr, 30) According to Neff, since about 2009, the school had provided "direct charity" by making tuition assistance available to families. (Tr, 32). Neff testified that given its status as a § 501(c)(3) corporation under the IRC, if the school became insolvent, its assets would have to go to another educational institution. (Tr, 40)

Neff indicated that the school's enrollment was way down over the past several years. (Tr, 36) She testified that the purpose of the tuition assistance program was to "help families who can't afford our full tuition to be able to send their children." (Tr, 52) Neff stated that the program was started in late 2008 or early 2009 and stemmed from the financial crash and the impact the crash was having on school families. (Tr, 53). Neff discussed the FAST service, explaining that tuition assistance was given to families who qualified for assistance under FAST and that some assistance was provided by the school even if FAST indicated that no award should be given. (Tr, 56) She testified that enrolled families and new families are considered equally with respect to tuition assistance. (Tr, 56) Neff noted that tuition assistance awards simply come in the form of a discounted tuition rate. (Tr, 57) There is no pool of funds from which awards are drawn. (Tr, 58)

Neff explained that families have no obligation to repay the discounted tuition under the tuition assistance program. (Tr, 59) Tuition assistance awards are based on financial need and are never for the full amount of the tuition.[6] (Tr, 60-61) Any tuition debt owed by a family from a previous year must be paid in full before a new tuition award is made (Tr, 61) Neff testified that there were four tuition assistance awards made in 2017 and again in 2018 relative to the Livonia campus. (Tr, 64) Neff asserted that no one who had applied for tuition assistance had been turned down by the school; some award amount was always offered. (Tr, 64, 67) There is no cap on the number of families who can obtain tuition assistance. (Tr, 65) When asked how the tuition assistance program furthered a charitable purpose, Neff explained, "Well, it's offering them a gift of a certain amount of money toward their tuition. No strings attached, really. No need to repay." (Tr, 66)

On cross-examination, the city's attorney sought to elicit more details as to why Neff was of the view that the school qualified as a charitable institution. (Tr, 83) In part, Neff observed that the school builds good citizens through its approach to education, that it would be "non-charitable" to produce adults who were not good citizens, and that the school was thus providing a gift to society that she "would consider charitable." (Tr, 85). Neff further testified, "I do think reaching the hearts and minds of literally thousands of children over 46 years has served a really

---

[6] She later made clear that "[w]e don't do a hundred percent tuition free." (Tr, 90)

good purpose and I would consider that charitable." (Tr, 87) Neff also reiterated that in her view the school was a charitable operation because of the tuition assistance program, which she deemed to be a gift to families. (Tr, 89) She additionally claimed:

> I think we've been charitable in that we have always given discounts for second children in the family. We have also discounted heavily the childcare portion of our program, up to 20 percent . . . . [W]e also have people who come and work and we give them also tuition abatement. [Tr, 94]

Neff did not consider the school to be designed to serve low income people. (Tr, 96) She observed that "[o]ur families are mostly middle to upper middle class and those middle class people who have incomes above the poverty line so they don't qualify for free programs." (Tr, 96) Neff believed that the school likely had some low-income families who earned below the poverty line, although it was possible that there were none; she was unsure on the matter. (Tr, 113) Neff testified in regard to the students at the Livonia campus who had received tuition assistance awards over the years, conceding that even after the award or discount, thousands of dollars still had to be paid to cover tuition costs. (Tr, 116-120) She further testified that the school could not afford to provide tuition assistance to everyone who was poor and applied for assistance. (Tr, 133) Neff explained that the school provided tuition assistance, not full scholarships. (Tr, 134).

At a point in the cross-examination, Neff was asked whether the school was organized chiefly, if not solely for charity, and she responded:

> We're not organized solely for charity, that's for certain, because we're a school. We're organized for education. Chiefly? I guess I don't know how to address that. (Tr, 138)

Neff acknowledged that people at the low end of the income spectrum would not be able to attend the school without financial assistance from some person or entity in addition to any tuition award given by the school. (Tr, 139) When asked again to explain how the overall nature of the school was charitable, Neff asserted that the school works with children in positive ways, striving to "help them become successful human beings." (Tr, 141) She also addressed myriad questions regarding the FAST service process, which we need not explore. Much of Neff's testimony confirmed the information found in documents that were admitted into evidence and discussed above.

*The MTT's Ruling*

On December 26, 2017, the MTT issued a written final opinion and judgment in the case. The MTT first reviewed the procedural history of the case and then summarized the school's arguments. The MTT made the following 12 findings of fact, which are not challenged by the school on appeal:

1. Petitioner is a non-profit, private, tuition based, Montessori School. It also offers before and after school care, including a "latch key program," for extended day students who require care beyond the end of the school day.

2. The children educated and cared for at Livonia Montessori are ages 2 years 9 months to 6 years of age.

3. Petitioner has owned the current Livonia site since April 2012 and began occupying the current Livonia site as of December 26, 2012.

4. During the 2014-2015 and 2015-2016 tax years, Petitioner's tuition ranged from $5,910, for half day, pre-school and kindergarten programming, to $11,520 for full day programming.

5. Petitioner offers reduced price tuition to some students. Financial information is first submitted to the FAST program for an unbiased aid recommendation.

6. However, despite FAST recommendations, Ms. Kay Neff, Head of School along with the Assistant Head of School, sometimes reduce tuition, defer tuition or set up payment plans for changes in financial circumstances after FAST application or during the school year.

7. Financial aid for a subsequent year may not be received until payment for the applicant's portion of the previous year's tuition has been received.

8. There are 31 students enrolled at Livonia Montessori School and its building is well maintained and aesthetically pleasing.

9. In the 2013-2014 school year, a $2,000 tuition grant was given to one Livonia Montessori Student, in 2014-2015, a $3,000 tuition grant was given to one Livonia Montessori Student and in 2015-2016, . . . a $3,865 tuition grant was given to one Livonia Montessori Student.

10. The bulk of Livonia Montessori's operating budget comes from tuition and fees. There are occasional gifts which go into a brokerage account for capital emergencies.

11. Tuition for Livonia Montessori Students was raised by the school for the 2014-2015 and 2015-2016 tax years.

12. Livonia Montessori does not have a scholarship fund, development fund, development director and does not participate in fundraising at the Livonia location. Petitioner's financial situation caused it to run with a deficit, during the tax years in question.

The MTT next rendered its conclusions of law. The MTT determined that the school satisfied the requirement that the real estate subject to the requested exemption—here the Livonia campus—be owned and occupied by the school. See *Wexford*, 474 Mich at 203 (element one in establishing an exemption under MCL 211.7o). At the end of its opinion and judgment, the MTT also concluded that the property occupied by the school was solely used for the purpose for which it was incorporated, satisfying element three under *Wexford*. *Id.* The

MTT devoted the majority of its opinion to the question whether the school is a nonprofit charitable institution. *Id.* (element two in establishing an exemption under MCL 211.7o).

The MTT acknowledged the six factors enunciated in *Wexford* and then proceeded to examine the facts of the case under each factor. With respect to *Wexford* factor one,[7] the MTT indicated that the school is a nonprofit Michigan corporation "and is designated as a federal 501(c)(3) organization exempt from taxation." The MTT next discussed *Wexford* factors two[8] and four[9] together because there was an overlap between the two. In regard to factor four, the MTT found that it was satisfied, considering that the school "brings hearts and minds under the influence of education" and "relieves a governmental burden." As to factor two, the MTT found that while the school "occasionally provides reduced price tuition, it is not operated chiefly, if not solely, for charity." The MTT, after noting the school's tuition rates from 2014 through 2016 and the tuition grants made over the three-year period, reasoned as follows:

> As will be explained [in] the discussion of *Wexford* factor six, below, the amount of "charity" given is irrelevant, however, here . . . virtually every student pays the full cost of the private education they receive, and as such the [MTT] finds, Petitioner does not exist chiefly, if not solely, for charity, nor does it devote itself to charitable works on the whole. Petitioner cannot demonstrate that it is actively pursuing its "charitable" mission to the exclusion of non-charitable activities. Ms. Neff testified, "[w]e're not organized solely for charity, that's for certain, because we're a school. We're organized for education." The [MTT] finds, here, Petitioner simply provides Montessori education for a fee, occasionally gives out partial scholarships, but raises tuition the following year in an attempt to fund the scholarships and stay in the "black." As such, the [MTT] agrees with Ms. Neff, Petitioner is not organized solely for charity.

The MTT next examined *Wexford* factor three.[10] The MTT, relying on *Baruch SLS*, 500 Mich 345, concluded that the school satisfied this factor, reasoning that the school's "selection

---

[7] "(1) A 'charitable institution' must be a nonprofit institution." *Wexford*, 474 Mich at 215.

[8] "(2) A 'charitable institution' is one that is organized chiefly, if not solely, for charity." *Wexford*, 474 Mich at 215.

[9] "(4) A 'charitable institution' brings people's minds or hearts under the influence of education or religion; relieves people's bodies from disease, suffering, or constraint; assists people to establish themselves for life; erects or maintains public buildings or works; or otherwise lessens the burdens of government." *Wexford*, 474 Mich at 215.

[10] "(3) A 'charitable institution' does not offer its charity on a discriminatory basis by choosing who, among the group it purports to serve, deserves the services. Rather, a 'charitable institution' serves any person who needs the particular type of charity being offered." *Wexford*, 474 Mich at 215.

criteria and restrictions, including a family's responsibility to pay its portion of tuition in full, before another year's grant can be made, bear a reasonable relationship to its alleged charitable goal."

With respect to *Wexford* factor five,[11] the MTT found "that operating at a loss does not, itself, determine that an organization is a charitable one, however, the fact that all monies collected from tuition are reinvested into the school indicates that Petitioner meets factor five." Finally, in regard to *Wexford* factor six,[12] the MTT found that the school "does not provide complete tuition grants as the awards are intended only to assist families, not replace their total tuition obligation, however, again the number and amount of partial scholarships given is irrelevant if the organization is a charitable one." The MTT appears to have found factor six moot, given that it concluded that the school is not a charitable institution.

The MTT concluded its opinion and judgment by ruling "that the subject property [Livonia campus] is not exempt as the property of a charitable institution for the 2015 and 2016 tax years and as such, the property assessments for those years are AFFIRMED."

### III. ANALYSIS

### A. THE SCHOOL'S ARGUMENTS ON APPEAL

On appeal, the school argues that the MTT erred as a matter of law when it determined that the school failed to meet the definition of a "charitable institution." More specifically, the school contends that the MTT improperly required a threshold of financial charitable giving in order to be considered organized chiefly, if not solely, for charity. The school further maintains that the MTT erred by restricting its analysis to the Livonia site versus looking at the institution as a whole. The school next argues that the MTT wrongly relied on the determination that the Livonia campus only offered one scholarship or award in support of its conclusion that there was not enough evidence to meet the standard of being organized solely or chiefly for charity. Finally, the school contends that the MTT improperly relied on a finding that the school raises tuition in the following school year in an effort to offset tuition scholarships and stay in the black.

### B. STANDARDS OF REVIEW AND STATUTORY CONSTRUCTION PRINCIPLES

We review decisions of the MTT for the misapplication of law or the adoption of a wrong legal principle, unless there is a claim of fraud. *SBC Health Midwest, Inc v City of Kentwood*, 500 Mich 65, 70; 894 NW2d 535 (2017). The MTT's factual findings are deemed conclusive

---

[11] "(5) A 'charitable institution' can charge for its services as long as the charges are not more than what is needed for its successful maintenance." *Wexford*, 474 Mich at 215.

[12] "(6) A 'charitable institution' need not meet any monetary threshold of charity to merit the charitable institution exemption; rather, if the overall nature of the institution is charitable, it is a 'charitable institution' regardless of how much money it devotes to charitable activities in a particular year." *Wexford*, 474 Mich at 215.

when they are supported on the whole record by competent, material, and substantial evidence. *Id.* We review de novo the MTT's construction of a tax statute. *Id.*

"When interpreting statutory language, our obligation is to ascertain the legislative intent that may reasonably be inferred from the words expressed in the statute." *Id.* (quotation marks omitted). This Court must consider the plain meaning of the critical words or phrases in the statute, along with contemplating their placement and purpose in the statutory scheme. *Id.* "This Court, as with all other courts, must give effect to every word, phrase, and clause in a statute, to avoid rendering any part of the statute nugatory or surplusage." *Id.* at 71. In general, we defer to the MTT's interpretation of a statute that it is delegated to administer, but that deference does not extend to matters where the MTT makes a legal error. *Id.* An MTT interpretation is entitled to respectful consideration; however, it cannot control in the face of contradictory statutory text. *Id.* "This Court has historically required that tax exemptions be narrowly or strictly construed in favor of the government." *Id.* This requirement, however, does not allow for a "strained construction" of a statute that is contrary to the intent of the Legislature. *Id.*

## C. DISCUSSION

In determining that the school did not qualify as a charitable institution for purposes of MCL 211.7o relative to the tax years in question and the Livonia campus, the MTT did not misapply the law; it did not adopt a wrong legal principle, and its ruling was supported by competent, material, and substantial evidence on examination of the whole record. The school is simply a private school that primarily operates on revenue generated by tuition and fees. It provides limited tuition discounts or awards to a very small number of enrolled families. The school is plainly not organized solely or chiefly for charity.

According to the MTT, the one, yet primary, element of the *Wexford* three-part test that the school did not satisfy for purposes of establishing the exemption under MCL 211.7o was the requirement that the school be a nonprofit charitable institution. *Wexford*, 474 Mich at 203. And with respect to *Wexford*'s six factors employed to determine whether an entity is a charitable institution, the MTT found the school lacking as to factor two, i.e., that the school was not organized solely or chiefly for charity. *Id.* at 215. This evidentiary shortcoming was based on the MTT's conclusions that virtually every student paid the full tuition and that the school just occasionally gave out partial tuition assistance awards.

The school maintains that "[t]he charity that [it] provides is a Montessori-based educational environment and a reduced-cost extended-day latch key program and [the school] provides this environment on a non-discriminatory basis." This argument is unavailing. The *Wexford* Court indicated that "charity" is "a gift" that is to be applied consistently with existing laws and for the benefit of an indefinite number of persons. *Id.* at 214. Providing an educational environment, no matter how excellent and productive that environment, does not, in and of itself, constitute charity or a gift when tuition is being charged. And an occasional tuition assistance discount and some reduced daycare costs did not convert the school into a charitable organization. Were we to follow the school's logic, any business charging a price for a product or services deemed beneficial to others and society would be considered a charitable institution, especially if discounts were available. Indeed, most if not all private schools, advancing specific teaching philosophies or religious-based education, would be charitable institutions under MCL

-12-

211.7o. We note that MCL 211.7n provides that "[r]eal estate or personal property owned and occupied by nonprofit . . . educational . . . institutions incorporated under the laws of this state with the buildings and other property thereon while occupied by them solely for the purposes for which the institutions were incorporated is exempt from taxation under this act."

The school complains that the MTT improperly required a threshold of financial charitable giving in analyzing whether the school was organized chiefly, if not solely, for charity. But the terms "solely" and "chiefly" demand some type of assessment of an institution's activities and whether those activities are devoted to charitable or non-charitable endeavors. The school relies heavily on *Wexford* in support of its position, analogizing the instant case to the facts in *Wexford*, where the petitioner was found to be a nonprofit charitable institution under MCL 211.7o.

The *Wexford* Court did indicate that the MTT adopted a wrong legal principle and misapplied the law by, in part, "focusing only on the amount of free medical services [the petitioner] provided" instead of considering the petitioner's "unrestricted and open-access policy of providing free or below-cost care to all patients who requested it." *Wexford*, 474 Mich at 195-196. The petitioner in *Wexford* was a nonprofit corporation that provided healthcare services in the county. The petitioner's articles of incorporation identified its mission " 'as providing access to quality and affordable health care services to the communities it serves.' " *Id.* at 196. The petitioner had a charity care policy that provided "free and discounted health care to anyone whose income [was] up to twice the federal poverty level." *Id.* at 197. It also had an open-access policy for Medicaid and Medicare patients, treating them "on a first-come, first-serve basis" and placing no limit on the number of Medicaid and Medicare patients that it served. *Id.* The petitioner reported that half of its patients utilized Medicaid or Medicare, which was a significantly higher percentage than those treated at other providers in the area. *Id.*[13]

The *Wexford* Court addressed the six factors, including factor two, and made the following observations regarding the petitioner:

---

[13] The Supreme Court noted additional services provided by the petitioner:

> Petitioner also engaged in a variety of health-based community services such as offering classes, lectures, training, testing and screening, and sports physicals. Other of its community endeavors included treating communicable diseases such as human immunodeficiency virus-acquired immune deficiency syndrome (HIV–AIDS), tuberculosis, hepatitis, and meningitis; treating maladies such as diabetes, obesity, and heart disease; and providing educational services such as disease screening, blood-borne pathogen instruction, defibrillator training, and first aid instruction. A significant number of these and other services provided by petitioner are not provided by anyone else in the community. [*Id.* at 198.]

Examining petitioner under these factors, we find that it is a charitable institution. Petitioner's medical clinic is readily distinguishable from the entities that we have found nonexempt under MCL 211.7o. Petitioner is not only organized as a charitable institution as reflected in its statement of purpose and its bylaws, but it devotes itself to charitable works on the whole. We [have] instructed . . . that an institution must be "organized chiefly, if not solely" for charity, and petitioner meets this test. Respondent has pointed to no other reason for petitioner's existence. Nor has respondent shown any evidence that petitioner is not actively pursuing its mission to the exclusion of any noncharitable activities. We find these omissions telling.

Petitioner is also fundamentally different from the Hillside Terrace home for the aged in *Michigan Baptist, supra,*[14] and the apartment complex in *Retirement Homes, supra.*[15] In both of those cases, the cost of maintaining the institutions was covered by fees collected from the residents. Prospective residents whose health or financial status did not meet strict requirements were not accepted. And although the petitioner in *Michigan Baptist* made some small exceptions in that regard, the general rule was of an exclusionary nature, not a charitable one.[16]

Petitioner in the present case shares no similarities with those institutions. Petitioner has a charity care program that offers free and reduced-cost medical care to the indigent with no restrictions. It operates under an open-access policy under which it accepts any patient who walks through its doors, with preferential treatment given to no one. Although petitioner sustains notable financial losses by not restricting the number of Medicare and Medicaid patients it accepts, it bears those losses rather than restricting its treatment of patients who cannot afford to pay. [*Id.* at 215-217.]

Here, the facts are not at all comparable to those presented in *Wexford*; rather, they are similar to those in *Mich Baptist* where the charitable institution exemption was not allowed. We initially note that educational services are provided for free by our public school system; the school is not filling any particular need or void. Further, the school does not provide unrestricted tuition assistance to anyone who comes through its doors considering that no one receives a full

---

[14] *Mich Baptist Homes & Dev Co v Ann Arbor*, 396 Mich 660, 671; 242 NW2d 749 (1976).

[15] *Retirement Homes of the Detroit Annual Conference of the United Methodist Church, Inc v Sylvan Twp*, 416 Mich 340, 348-349; 330 NW2d 682 (1982).

[16] In *Mich Baptist*, 396 Mich at 667-669, the petitioner offered reduced rates to four of the 72 residents; it waived the fees for one resident; it was funded by resident fees, loans, and debentures; it had not solicited gifts to cover costs; the residents were selected after an application process "that asked them to fully detail their financial status and their health," and the petitioner, while suffering losses for two straight years, conceded that it would raise fees should the losses continue.

discount of the tuition cost, and thousands of dollars of tuition remain owing by a family receiving an award. Thus, a family who could not afford to pay any tuition given its financial situation would not be able to attend the school. Also, there is no evidence that the school was organized specifically as a charitable institution. Additionally, the cost of maintaining the school is covered by student tuition and fees, backed up by two reserve accounts, not through solicited donations, fundraising, or endowments. And the school, while making exceptions, gives tuition assistance awards based on applications submitted through FAST, which considers the financial status of families. Moreover, Neff's testimony plainly revealed a link between the rate of tuition and the costs to run the school, implicitly indicating that the cost of tuition assistance awards ultimately have some bearing on tuition rates. Comparable to the facts in *Mich Baptist*, the school has merely reduced the costs of attending the school to a handful of families. The extent of the charitable services the petitioner in *Wexford provided* went way beyond any provided by the school in this case. It is the overall nature of an institution, as opposed to its specific activities, that must be evaluated in determining whether the institution is a charitable institution under MCL 211.7o, *Wexford*, 474 Mich at 212. Here, the overall nature of the school does not reflect a charitable institution. In sum, the school is not an institution organized solely or chiefly for charity.

The school next argues that the MTT erred by restricting its analysis to the Livonia campus versus looking at the institution as a whole. First, the request for a tax exemption under MCL 211.7o only pertained to the school's Livonia campus, so the focus was properly on that location. Regardless, the situation and circumstances, along with the relevant policies, programs, philosophy, and procedures, are essentially the same across the three campuses and reflect the institution as a whole. We find no error requiring reversal in this respect.

The school also contends that the MTT improperly relied on the determination that the Livonia campus only offered one scholarship or award in support of its conclusion that there was not enough evidence to meet the standard of being organized chiefly, if not solely, for charity. The school argues that Neff testified that a failed FAST application would not serve as a bar to tuition assistance, that there was a discount for second children, that there were discounts for childcare services, and that there was tuition abatement for staff. The school asserts that had the MTT considered this evidence, as well as the tuition award, it would have determined that the school was organized chiefly for charity. The MTT was plainly aware of this evidence, and it specifically referenced the fact that a denial by FAST did not preclude the school from providing tuition assistance. And the argument cannot overcome the MTT's finding that partial awards were only occasionally made, as virtually every student paid the full cost of the education. A few additional discounts and abatements do not tip the scales in favor of the school's claim for a charitable institution exemption. Its overall nature remains non-charitable.

Finally, the school contends that the MTT wrongfully relied on a finding that the school raises tuition in the following school year in an effort to offset the tuition scholarships and stay "in the black". The school argues that Neff's testimony regarding her setting of tuition rates revealed that she did not take into consideration past losses or previously discounted tuition. The school notes that Neff testified that the tuition rates were not set at an amount that would cover all of the school's expenses. Although Neff testified that she did not attempt to make up the entire deficit, she did state that she tried to set the tuition rates "more in line with being in the black." (Tr, 51) This testimony reflected that the tuition rate had some connection to costs, and

there can be no dispute that discounted tuition was relevant to the equation. The MTT found that tuition rates were increased for the 2015-2016 school year from the prior year in order to cover increased costs. There was no error in this finding.

We affirm. Having fully prevailed on appeal, the city may tax costs. MCR 7.219.

/s/ Brock A. Swartzle
/s/ Jane E. Markey
/s/ Amy Ronayne Krause